Gary J. PEARSON, Plaintiff,

v.

FORD MOTOR CO.; Ford Motor Credit Co.; Ford Leasing Development Co.; Fort Walton Beach Lincoln–Mercury, Inc.; and Beal Parkway Lincoln–Mercury, Inc., Defendants.

No. 93–30031–RV.

United States District Court,
N.D. Florida,
Pensacola Division.

Sept. 30, 1994.

James W. Grimsley, Smith, Grimsley, Remington, Bauman, Petermann, Pinkerton & Saxer, Ft. Walton Beach, FL, Kenneth L. Funderburk, Pro Hac Vice, Funderburk, Day & Lane, Phenix City, AL, for plaintiff.

Patricia B. Cunningham, Pro Hac Vice, John H. Fleming, Ann G. Fort, Sutherland, Asbill & Brennan, Atlanta, GA, Bruce A. McDonald, McDonald, Fleming, Moorhead & Ferguson, Pensacola, FL, for Ford Motor Co., Ford Motor Credit Co., Ford Leasing Development Co., Ford Corporations from "A" through "Z", Ft. Walton Beach Lincoln–Mercury, Inc.

Thomas R. Jenkins, Jenkins & Matthews, Bruce A. McDonald, McDonald, Fleming, Moorhead & Ferguson, Pensacola, FL, for Beal Parkway Lincoln–Mercury, Inc.

## ORDER

VINSON, District Judge.

Pending is the motion of defendants Ford Motor Co., Ford Leasing Development Co., and Fort Walton Beach Lincoln–Mercury, Inc. for summary judgment on all counts of the amended complaint. (doc. 73). Also pending is the plaintiff's cross motion for partial summary judgment on Counts I and X of the amended complaint. (doc. 71). The plaintiff seeks a declaration that he is an automobile dealer pursuant to the federal and Florida Automobile Dealers' Day in Court Acts. Defendant Ford Motor Credit Co. has moved for summary judgment on all counts of the amended complaint on the basis that it is not a proper party to this lawsuit.

(doc. 77). Finally, also pending is defendant Beal Parkway Lincoln–Mercury Inc.'s motion for summary judgment on Count X of the amended complaint. (doc. 80). Because the motion filed jointly by defendants Ford Motor Co., Ford Leasing Development Co., and Fort Walton Beach Lincoln–Mercury, Inc. is dispositive, I need not consider the other motions.

## I. BACKGROUND

Except as noted, the following facts are undisputed in the record. As part of its efforts to increase the number of minority owners, defendant Ford Motor Co. ("Ford") operates a dealer development plan ("DDP") in which it assists minorities in purchasing and operating dealerships. A corporate dealership is established, and the individual identified as a possible future minority owner/dealer is hired to operate the dealership. The potential minority dealer is given an opportunity to become a minority stockholder in the dealership, and is given the right to gradually purchase all of Ford's stock from the profits of the dealership. Thus, if the individual is successful in operating a Ford dealership, he can gradually become the owner of an automotive dealership with only a modest personal investment.

Ford recruited plaintiff Gary J. Pearson, a black man already employed by Ford, as a potential minority owner. Pearson and Ford entered an agreement for Pearson to participate in the DDP on July 12, 1983. Ford formed a corporation, defendant Fort Walton Beach Lincoln–Mercury, Inc. ("FWBLM"),[1] to own and operate the dealership. FWBLM was formally granted Lincoln–Mercury dealership rights on July 18, 1983. Pearson was not a party to this agreement.

Ford supplied $320,000.00 capitalization for the new dealership ($160,000 of which was long term notes), and Pearson was required to deposit $80,000, which was to be held in escrow for six months. During the initial six months, Pearson would operate the dealership as a salaried employee of FWBLM. At the conclusion of the initial period, Pearson had the option of converting his $80,000.00 deposit into common stock in FWBLM, or withdrawing from the endeavor and having his deposit returned.

On February 1, 1984, Pearson elected to continue in the DDP program. On that date he entered a dealer development agreement with Ford and a management agreement with FWBLM. Pursuant to the dealer development agreement, Ford received 1,600 shares of convertible preferred stock in FWBLM, and Pearson received 800 shares of common stock. The common stock had no voting rights as long as any preferred stock was outstanding.[2] The agreement provided that if the dealership was profitable, a portion of Pearson's share of the profits would be used to gradually purchase Ford's preferred stock in FWBLM and convert it into common stock. However, Pearson could purchase the stock only from the profits, not with any other funds. Under this plan, if (but only if) the dealership was profitable under his management, Pearson would eventually own the dealership. Ford had no obligation to provide any additional capitalization, but if it elected to do so, Ford would receive additional preferred stock (and long term notes) in proportion to any additional capital contributions.

The initial board of directors of FWBLM was composed of Pearson and three other directors chosen by Ford. The management agreement provided that Pearson was to serve as the president and operator of FWBLM. Pearson was the on-site manager and was responsible for the day-to-day operations of the dealership. Both the dealer development agreement and the management agreement were terminable at will by either party. Both agreements also stated that termination was likely if the dealership

---

1. The parties refer to the corporation as both "Fort Walton Beach Lincoln–Mercury, Inc." and "Ft. Walton Beach Lincoln–Mercury, Inc." in the pleadings. Because it appears to be its formal legal name, and for the sake of consistency, I have used Fort Walton Beach Lincoln–Mercury, Inc.

2. This was changed in 1985 to comport with new IRS regulations which required a minority owner to have voting rights.

lost money to the point that Pearson's equity interest had no value.

The dealership was profitable in 1984, 1985, and 1986. Because these profits were used to purchase stock, Pearson owned 79% of the total stock in FWBLM by the end of 1986. However, in 1987 and the first quarter of 1988, the dealership lost money. As a result of these losses, offset by Ford's further capital contributions, Pearson's ownership interest had declined to 34% of the total stock by the end of 1988. The dealership continued to incur operating losses in 1989 and 1990.

For the first few years, the dealership was operated from a facility leased from the previous Lincoln–Mercury dealer. That lease was due to expire in 1988, and the decision was made to relocate the dealership. A site was chosen on Beal Parkway. Defendant Ford Leasing Development Co. ("Ford Leasing") purchased the land, constructed the buildings, and leased the site to FWBLM. Pearson requested that the lease include a provision granting FWBLM the option of purchasing the real estate from Ford Leasing. Ford refused, and on May 3, 1988, Pearson executed the lease on behalf of FWBLM, without the purchase option. Ford contends that Pearson readily agreed to the move; Pearson maintains that he opposed it, and that Ford deliberately chose a poor site so that the dealership would fail.

Apparently, the dealership was again profitable for the first six months it was at the new location. However, beginning in late 1988, it began to show losses. The losses increased dramatically in 1989 and 1990. Ford was required to provide the dealership with more than one million dollars in additional capitalization during the time Pearson operated it. Because of these losses, Pearson's common stock in FWBLM had no value as of the end of 1989 and until the time he was terminated. The board of directors of FWBLM voted on February 26, 1991, to terminate Pearson as president of FWBLM and operator/manager of the dealership.

Pearson commenced this suit alleging various illegalities in his termination as president of FWBLM. The amended complaint purports to state ten separate causes of action.

Count I is based on the federal Automobile Dealers Day in Court Act; Count II alleges common law fraud; Count III alleges "interference with corporate governance—breach of contract;" Count IV alleges "interference with corporate governance—fraud;" Count V alleges breach of fiduciary duty, Count VI alleges breach of the duty of good faith; Count VII alleges conversion; Count VIII alleges trespass; Count IX seeks injunctive relief; and Count X purports to state a claim pursuant to the Florida Automobile Dealers Day in Court Act. Counts II, IV, V, VI, VII, and VIII demand punitive damages. Named as defendants are Ford, FWBLM, Ford Leasing Development Co., Ford Motor Credit, and Beal Parkway Lincoln–Mercury, Inc., the current dealer, who purchased the dealership from Ford in October 1991.

## II. ANALYSIS

### A. *Summary Judgment Standard*

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. As the Supreme Court of the United States has instructed, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986); *Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987).

However, summary judgment is improper "[i]f a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact." *Cornelius v. Highland Lake,* 880 F.2d 348, 351 (11th Cir.1989), *cert. denied,* 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990). An issue of fact is "material" if it might affect the outcome of the

case under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Id. See also Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986).

■ On summary judgment motion, the record and all inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party. *See Souran v. Travelers Ins. Co.*, 982 F.2d 1497, 1502 (11th Cir.1993). Furthermore, the court must consider the entire record in the case, not just those pieces of evidence which have been singled out for attention by the parties. *See Clinkscales v. Chevron USA, Inc.*, 831 F.2d 1565, 1570 (11th Cir.1987).

**B.  Count I: Federal Automobile Dealers' Day in Court Act.**

■ Count I is based on the federal Automobile Dealers' Day in Court Act ("ADDCA") [15 U.S.C. §§ 1221–1225]. The defendants assert that summary judgment should be granted on this claim for three separate reasons: (1) Pearson does not have standing to bring a claim under the Act, (2) the statute of limitations has run, and (3) accepting all the plaintiff's factual allegations as true, they do not violate the ADDCA as a matter of law. I shall consider each separately.

**1.  Standing.**

The ADDCA provides that "an automobile dealer may bring suit against any automobile dealer engaged in commerce...." 15 U.S.C. § 1222. The ADDCA defines "automobile dealer" as follows:

> The term "automobile dealer" shall mean any person, partnership, corporation, association, or other form of business enterprise resident in the United States or in any Territory thereof or in the District of Columbia operating under the terms of a franchise and engaged in the sale or distri-

bution of passenger cars, trucks, or station wagons.

Title 15, United States Code, Section 1221(c). The defendants assert that FWBLM, not Pearson, was the automobile dealer under the statutory definition. The defendants contend that since Pearson was not an automobile dealer, he lacks standing to bring suit pursuant to the ADDCA.

It is undisputed that the franchise agreements at issue in this case were between Ford and FWBLM. Pearson was a minority stockholder and an officer of FWBLM, but he was never a party to FWBLM's franchise agreement with Ford. At all times material to this lawsuit, the corporation was the automobile dealer.[3] Under the plain language of the statute, Pearson was not an automobile dealer and lacks standing. Nevertheless, Pearson argues that a liberal construction of the statutory definition is more consistent with the intent of Congress in enacting the ADDCA—to protect local dealers from the disparate bargaining power enjoyed by large automobile manufacturers.

Other circuits have rejected similar contentions by stockholders and officers of corporate dealerships with factual situations more compelling than Pearson's. *See, e.g., Olson Motor Co. v. General Motors Corp.*, 703 F.2d 284, 289 (8th Cir.), *cert. denied*, 464 U.S. 894, 104 S.Ct. 240, 78 L.Ed.2d 231 (1983) (sole stockholder of corporate dealership who had personally guaranteed corporate obligations lacked standing); *Sherman v. British Leyland Motors, Ltd.*, 601 F.2d 429, 439 (9th Cir.1979) (sole stockholder of corporate dealership who had personally guaranteed corporate obligations lacked standing); *Vincel v. White Motor Corp.*, 521 F.2d 1113, 1120 (2nd Cir.1975) ("When, as here, a dealership is doing business in corporate form, the statute contains no hint that it intends a departure from the established principle that the locus of the right of action is the corporation."). However, in a case factually similar to this case, the Seventh Circuit reached a contrary result. *Kavanaugh v. Ford Motor Co.*, 353 F.2d 710

---

**3.** Even after Pearson was discharged as president and manager, FWBLM remained the dealer and operated the dealership for six months.

(1965). There, Daniel F. Kavanaugh and Ford had entered a dealer development plan similar to the one between Pearson and Ford.[4] A corporate dealership was formed with Ford providing the majority of the original capitalization. The board of directors consisted of Kavanaugh and three directors chosen by Ford. Kavanaugh was the president of the corporation and manager of the dealership, and had the right to gradually purchase Ford's equity interest with his yearly operator's "bonus," the amount of which was determined by the dealership's profits.

The dealership was initially profitable, but then began to lose money. After approximately two and one-half years of losses, the board of directors removed Kavanaugh as president and terminated his management contract. Ford simultaneously canceled the dealer development agreement with Kavanaugh. Kavanaugh filed suit against Ford alleging breach of the ADDCA. Ford moved for summary judgment based on Kavanaugh's lack of standing. On interlocutory appeal, the Seventh Circuit held that a minority stockholder in a corporate dealership controlled by an automobile manufacturer did have standing to bring a claim pursuant to the ADDCA. The *Kavanaugh* court reasoned that a corporation controlled by Ford would never "seek the protection afforded by the statute," and sue Ford. 353 F.2d at 717. The *Kavanaugh* court "infer[red] that the corporate format was deliberately adopted in order to defeat the legislative purpose of the act." *Id.* Despite the plain language of the statute, the Seventh Circuit held that because of its interpretation of Congress' intent in enacting the ADDCA, Kavanaugh was an automobile dealer within the meaning of the ADDCA, and that he had standing to bring a claim under the Act.

None of the cases cited above are binding precedent in this circuit. However, the Former Fifth Circuit considered whether the stockholders of a corporate automobile dealership had standing to bring an ADDCA

claim in *York Chrysler–Plymouth, Inc. v. Chrysler Credit Corp.*, 447 F.2d 786 (5th Cir.1971).[5] In that case, C.C. York was the president of York Chrysler–Plymouth, Inc. and owned two-thirds of the corporate stock. His son, Jerry A. York, was vice president of the corporation and owned the other one-third of the stock. After Chrysler Credit Corporation conducted an audit and discovered that the dealership had sold 22 cars "out of trust," i.e., sold vehicles in which Chrysler Credit held a security interest without remitting the proceeds, Chrysler Credit seized the assets of the dealership. Chrysler Motors let the dealership agreement with York Chrysler–Plymouth, Inc. expire of its own accord two months later.

The Yorks brought suit individually and in the name of the corporation, asserting, *inter alia*, an ADDCA claim against Chrysler Motors Corp. and Chrysler Corp. The Former Fifth Circuit first held that: "The individuals would not come within the scope of the Act merely because they were sole stockholders, officers and directors of the corporate franchise holder." 447 F.2d at 790 (citing *Schaffer v. Universal Rundle Corp.*, 397 F.2d 893 (5th Cir.1968) and *Martens v. Barrett*, 245 F.2d 844 (5th Cir.1957)). However, because the franchise agreement explicitly conditioned the issuance and continuation of the dealership relationship upon the active participation of the Yorks, the Former Fifth Circuit held that they had individual standing to pursue an ADDCA claim:

> [W]e believe the Yorks were made essential to operation of the dealership by the agreement with Chrysler Motors. The Direct Dealer Agreement held by the Yorks at the old location recited that Chrysler Motors Corporation "has entered this agreement relying on the active, substantial and continuing personal participation" of C.C. York and Jerry A. York, required them to maintain beneficial ownership and control of the stock in the dealership corporation, could be terminated if either of them died or failed to continue in

---

4. The *Kavanaugh* opinion does not state whether Daniel Kavanaugh was a member of a minority group.

5. Decisions of the Fifth Circuit issued prior to October 1, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

the active management of the dealership or was convicted of certain crimes, and could even be terminated if Chrysler Motors thought that a disagreement between them might adversely affect the business.

447 F.2d at 790–91.

*York Chrysler–Plymouth, Inc. v. Chrysler Credit Corp.* is the controlling precedent and is dispositive. To the extent that the Seventh Circuit's *Kavanaugh* decision is to the contrary, I expressly decline to follow it because it fails to apply the plain language of the statute. Here, Pearson was an officer and director of FWBLM, and was also a minority stockholder, although he acknowledges that his equity interest had no value at the time of his termination as manager of the dealership. However, unlike the Yorks, there is no evidence in the record that Ford made the continuance of the FWBLM dealership conditional upon Pearson's continued active participation. Quite to the contrary, the agreements between the parties made it clear that if Pearson was unable to profitably operate FWBLM, he could be replaced as president of the dealership.

Pearson's status as minority stockholder and officer and director is inadequate to bring him within the statute. *York Chrysler–Plymouth, supra,* 447 F.2d at 790. The plain language of the statute mandates that construction.[6] Accordingly, I conclude that plaintiff Gary Pearson was not an "automobile dealer" pursuant to the federal ADDCA and, therefore, lacks standing to bring an ADDCA claim. Although Pearson's lack of standing is sufficient basis to grant the defendants' motion and to deny the plaintiff's motion for summary judgment as to Count I, I shall also consider briefly the other two bases for the defendants' motion, the statute of limitations, and the legal sufficiency of the alleged violations of the ADDCA.

### 2. Statute of Limitations.

The ADDCA contains its own statute of limitations: "Any action brought pursuant to this chapter shall be forever barred unless commenced within three years after the cause of action shall have accrued." 15 U.S.C. § 1223. Pearson filed the original complaint in this action on January 25, 1993. Thus, any potential ADDCA claim which accrued prior to January 25, 1990, is barred by the statute of limitations.

Pearson concedes that most of the alleged incidents of bad faith occurred prior to January 25, 1990, but contends that the cause of action did not accrue until the franchise was "terminated" by Pearson's removal. The plaintiff states in his memorandum, "By the very terms of Section 1222 of the Federal ADDCA, the cause of action does not accrue until the termination, cancellation or nonrenewal of the franchise by the manufacturer." (doc. 92, p. 21). That is simply wrong. The statute provides that an automobile dealer may bring suit against a manufacturer for failure "to act in good faith in performing or complying with any of the terms or provisions of the franchise, *or* in terminating, canceling, or not renewing the franchise with said dealer.*" 15 U.S.C. § 1222.

In construing Section 1223, the Tenth Circuit has addressed how the statute of limitations applies:

> The acts complained of ... do not relate to the termination of the franchise but to alleged coercion and intimidation through bad faith conduct of Chrysler. If the alleged acts are actionable at all, they are made so by the statute, and the cause of action accrued when they were committed. The statutory remedy was available, even though there was no termination of the franchises. It is conceded that the acts, except for 6(d), occurred more than three years prior to the commencement of this

---

6. The plaintiff also asserts that he had to be the dealer because Section 320.645, Florida Statutes, prohibits a manufacturer from owning a dealership. However, the statute specifically exempts dealerships which were owned by the manufacturer prior to May 31, 1984. § 320.645(2), Fla. Stat. (1993). It is undisputed that FWBLM was established in July 1983. The statute also permits a manufacturer to own a dealership when

"in a bona fide relationship with an independent person ... who has made a significant investment that is subject to loss in the dealership and who can reasonably expect to acquire full ownership of the dealership on reasonable terms and conditions." § 320.645(1)(b), Fla.Stat. (1993). Clearly, FWBLM is exempt from the statute under both exemptions.

action. Consequently, the statute of limitations barred a recovery for damages growing out of them.

*Hanley v. Chrysler Motors Corp.*, 433 F.2d 708, 711 (10th Cir.1970). Bad faith termination, cancellation, or non-renewal of a franchise is actionable under the ADDCA. However, bad faith in "performing or complying" with any term of a franchise is independently actionable under the statute, without a termination of the franchise.

As discussed below, the plaintiff alleges that Ford coerced him into executing the lease for the new facility by threatening to terminate the franchise. The plaintiff does not state on what date this alleged coercion occurred. However, it had to have occurred on or before May 3, 1988, the date Pearson signed the lease. The actual letter signed by Pearson acknowledging the consequences of failure to execute the lease is dated March 30, 1987. (*See* Ex. 24 to the original complaint.) Therefore, I find that to the extent that the claim in Count I is based on the defendants allegedly coercing and intimidating Pearson into executing the lease on the new FWBLM facility, it is barred by the statute of limitations.

Pearson also alleges that Ford misrepresented to him the assistance available to potential minority dealers in order to induce him to enter the agreement. However, as set out below, a "bad faith" violation of the ADDCA requires coercion or intimidation. Pearson has not alleged that Ford coerced or intimidated him into entering the DDP. There is no inference that can reasonably be drawn from the evidence that there was any coercion or intimidation involved in the agreement. Therefore, I need not consider the more difficult issue of when and how a cause of action for fraud in the inducement accrues, but simply find that he has not alleged or established a bad faith violation actionable under the federal ADDCA for any acts prior to January 25, 1990.

### 3. Violations of the ADDCA.

■ The federal ADDCA grants an automobile dealer a cause of action against an automobile manufacturer who fails "to act in good faith in performing or complying with any terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer:" 15 U.S.C. § 1222. The act defines good faith as:

> (e) The term "good faith" shall mean the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided,* That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

15 U.S.C. § 1221(e).

Contrary to the assertions of the plaintiff's memorandum, "bad faith under this Act [ADDCA] has been narrowly defined and construed strictly." *Carroll Kenworth Truck Sales v. Kenworth Truck Co.*, 781 F.2d 1520, 1525 (11th Cir.1986). An automobile manufacturer's "lack of fairness" is not bad faith pursuant to the ADDCA. *Id.* Rather, a showing of bad faith for purposes of the ADDCA requires actual or threatened coercion or intimidation:

> Case law is clear that a manufacturer fails to act in good faith for purposes of recovering under this Act only if its conduct amounts to coercion or intimidation. In absence of coercion, intimidation or threats thereof, there can be no recovery under the Act, even if the manufacturer otherwise acts in "bad faith" as that term is normally used.

*Cabriolet Porsche Audi, Inc. v. American Honda Motor Co.*, 773 F.2d 1193, 1120 (11th Cir.1985), *cert. denied,* 475 U.S. 1122, 106 S.Ct. 1641, 90 L.Ed.2d 186, *reh'g denied,* 476 U.S. 1189, 106 S.Ct. 2929, 91 L.Ed.2d 557 (1986). *See also, General GMC, Inc. v. Volvo White Truck Corp.*, 918 F.2d 306, 308 (1st Cir.1990); *Dreiling v. Peugeot Motors of America, Inc.*, 850 F.2d 1373, 1378 (10th Cir.1988); *Empire Volkswagen, Inc. v. World–Wide Volkswagen Corp.*, 814 F.2d 90, 95 (2nd Cir.1987); *Bob Maxfield, Inc. v. American Motors Corp.*, 637 F.2d 1033, 1038 (5th Cir.), *cert. denied,* 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981); *Autohaus*

*Brugger, Inc. v. Saab Motors, Inc.,* 567 F.2d 901, 911 (9th Cir.), *cert. denied,* 436 U.S. 946, 98 S.Ct. 2848, 56 L.Ed.2d 787 (1978); *Minson Plymouth, Inc. v. Chrysler Motors Corp.,* 554 F.2d 1266, 1267 (4th Cir.1977); *Fray Chevrolet Sales, Inc. v. General Motors Corp.,* 536 F.2d 683, 685 (6th Cir.1976); *Globe Motors, Inc. v. Studebaker–Packard Corp.,* 328 F.2d 645, 646 (3rd Cir.1964).

■ Many of the alleged acts of the defendants which the plaintiff claims amount to coercion and intimidation occurred either in the original creation of the dealership or in the decision to move the dealership to the Beal Parkway location. In his verified amended complaint, the plaintiff alleges an elaborate conspiracy to mislead him (and other minorities) about the amount of "special assistance" Ford will provide him.[7] Pearson claims Ford lied to him and broke promises to give him special help. While this may be sufficient to state a claim for fraud, breach of oral or implied contract, or some other state law cause of action, it is not a basis for a federal ADDCA claim. A manufacturer's "deceitful and unkept 'promise,'" even if done in "'bad faith' in the usual sense of the term," is not a violation of the ADDCA. *Bob Maxfield, Inc. v. American Motors Corp.,* 637 F.2d 1033, 1039 (5th Cir.), *cert. denied,* 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981). Accepting as true the plaintiff's assertion of repeated misrepresentations, there is no evidence of coercion or intimidation, and thus no bad faith for purposes of the federal ADDCA.

The gist of the plaintiff's controversy with the defendants appears to involve the dealership's move to the new location. Pearson alleges that one or more of the defendants chose a poor location, constructed an excessively expensive facility, lied to him about the sales volume necessary to underwrite the cost of the new facility, and deliberately set a rental rate that FWBLM could not afford so that FWBLM would incur heavy losses and Pearson could be terminated as president. Pearson further alleges that the defendants

threatened to terminate the dealership if he did not sign the lease agreement for the new facility. A threat to terminate the dealership agreement can constitute coercion or intimidation under the ADDCA. However, as discussed above, this alleged threat had to have occurred on or before May 3, 1988, the date Pearson executed the lease, and the claim is barred by the statute of limitations.

■ Pearson also alleges that the defendants violated the ADDCA when they "terminated" the dealership by dismissing him as president. Termination of a franchise can constitute bad faith pursuant to the ADDCA, but only if it is done for an improper purpose and involves coercion or intimidation.

> Coercion or intimidation must include a wrongful demand which will result in sanctions if not complied with, and it is necessary to consider not only whether the manufacturer brought pressure to bear on the dealer, but also his reason for doing so. When a termination or nonrenewal of a franchise is involved, there must be a 'causal connection' between the dealer's resistance to the coercive conduct and the termination or nonrenewal for there to be a lack of good faith under the Act.

*Autohaus Brugger, Inc. v. Saab Motors, Inc., supra,* 567 F.2d 901, 911 (9th Cir.1978) (citations omitted).

■ Pearson's removal as president and director of FWBLM is not a bad faith termination of a franchise under the ADDCA for at least three reasons. Initially, the franchise was not terminated. Pearson was replaced as president, but FWBLM continued as the dealer on the same terms as before. Second, even if Pearson's removal could be deemed a termination of a franchise, the termination under the expressed terms of both the dealer development agreement and the management agreement (which both provided that termination was likely if the dealership lost money to the extent that Pearson's equity interest had no value) does not constitute intimidation or coercion. Third,

---

7. While the complaint is verified and includes a large number of attached exhibits, with respect to the alleged conspiracy it consists almost entirely of legal conclusions. There is no direct factual evidence of a conspiracy in the record.

However, for purposes of ruling on the motion for summary judgment as to Count I, I have assumed that the conspiracy alleged by the plaintiff did in fact exist, and have drawn all inferences in his favor.

even if I assume that there was intimidation or coercion, there is no evidence of any casual connection between the intimidation or coercion and the removal, as discussed below.

The plaintiff argues that various Ford officials had made the decision to terminate Pearson prior to coming to Fort Walton Beach to meet with him. Based on a confidential Ford communication Pearson obtained through discovery, that appears to be true. Exhibit E appended to the plaintiff's memorandum (doc. 92) is a memorandum from a Ford official, Thomas J. Boyle, concerning a meeting with Pearson scheduled for the next day. Boyle stated, "Ford DD's Tom Dorsey will ask for the resignation of Operator Gary Pearson, who is losing money faster than the Pentagon." Boyle went on to offer his estimation of what was likely to happen: "Pearson likely will refuse. Ford likely will terminate him."

Certainly, a reasonable factfinder could conclude from this evidence that because he was "losing money faster than the Pentagon," Ford had at least tentatively decided to terminate Pearson prior to meeting with him. That is a legitimate reason for termination, and termination under those conditions was likely, under the terms of the two agreements involved. Terminating a franchise (or in this case an "operator") for a legitimate reason is not a violation of the federal ADDCA. *Dick Winning Chrysler–Plymouth of Ft. Myers, Inc. v. Chrysler Motors Corp.*, 750 F.2d 895, 899 (11th Cir.1985). Pearson also asserts that Ford terminated him because it wanted to install another operator/manager at the dealership. Again, even if true, that is not a violation of the ADDCA. *Dreiling v. Peugeot Motors of America, Inc.*, 850 F.2d 1373 (10th Cir.1988).

The plaintiff's most serious claim of coercion involves threats of criminal prosecution. Pearson alleges that after the FWBLM board of directors voted at a meeting held on February 26, 1991, to terminate him as president, two of the Ford directors, K.F. Harden and R.W. Sullivan, indicated that it was Ford's position that Pearson had converted corporate property by removing antique automobiles which belonged to FWBLM from the premises. Harden and Sullivan allegedly indicated that if Pearson refused to return the automobiles, he might be liable to criminal prosecution. Pearson contends that Ford threatened criminal prosecution to coerce him into voluntarily resigning as president of FWBLM, although he does not deny the removal of the antique automobiles.

Pearson has submitted the affidavit of J. Ladon Dewrell, an attorney who was present at the February 26 meeting as the plaintiff's legal counsel. Dewrell does not allege that Harden and Sullivan explicitly connected the possibility of prosecution with Pearson's decision not to voluntarily resign. However, Dewrell asserts that "any reasonable person" would have inferred that. Even so, the alleged coercion is directed against Pearson as an employee of the dealership, not against the dealership. While this might possibly state a claim for tortious interference with business relationship, or some other cause of action, it was directed against an employee, not an automobile dealership, and is not a violation of the ADDCA as a matter of law. Further, the board had already voted to terminate him when the alleged threat was made, so there could not have been any coercive termination.

The plaintiff also alleges that the defendants violated the Florida Automobile Dealers' Day in Court Act, and then asserts, without citing any authority, that a violation of the Florida ADDCA is *per se* a violation of the federal ADDCA. Despite extensive research, I have been unable to discover any reported case which supports that position. It is not the law in this circuit. The Eleventh Circuit has held that a manufacturer's actions in violation of the Alabama ADDCA did not violate the federal ADDCA. *Carroll Kenworth Truck Sales, Inc. v. Kenworth Truck Co.*, 781 F.2d 1520, 1528 (11th Cir. 1986). It may be that plaintiff is referring to Section 320.645 of the Florida Act, which is not applicable. *See* fn. 6, *supra*.

In general opposition to the defendants' motion for summary judgment, the plaintiff contends that bad faith is always a question of fact for the jury, and that summary judgment is, therefore, always improper in an ADDCA claim. That contention simply is

not the law. *General GMC, Inc. v. Volvo White Truck Corp.,* 918 F.2d 306 (1st Cir. 1990); *Sherman v. British Leyland Motors, Ltd.,* 601 F.2d 429 (9th Cir.1979). Specifically, the Eleventh Circuit has noted that just because the lack of good faith is usually a jury question, that does not mean that every ADDCA claim must go to the jury:

> To say that an issue is a jury question is not to say that the issue should go to the jury in all instances. This proposition, true generally, is equally true in the context of the existence of good faith under the Automobile Dealers' Day in Court Act. If such bare facts as these are held to be sufficient to create a jury question on the issue of good faith as defined in the statute, we see no end to rightfully terminated dealers hauling manufacturers into court in anticipation of a free shot at a jury verdict, even when there is no evidence to support a verdict in their favor. Such a result is inconsistent with the restricted definition of good faith in the Automobile Dealers' Day in Court Act.

*Carroll Kenworth Truck Sales v. Kenworth Truck Co.,* 781 F.2d 1520, 1526, 28 (11th Cir.1986).

This is a case where, on the record, only one reasonable conclusion can be reached regarding the alleged federal ADDCA claim:

> [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.... [The summary judgment] standard mirrors the standard for a directed verdict under the Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 212–213 (1986) (citations omitted). The plaintiff is not an automobile dealer as defined in the federal ADDCA, and thus lacks standing to bring this claim. Moreover, no reasonable jury could return a verdict in favor of the plaintiff from the evidence in the record. Accordingly the defendants' motion for summary judgment on Count I of the amended complaint is GRANTED, and the plaintiff's motion for partial summary judgment on Count I is DENIED.

**C. State Law Claims.**

Counts II through VIII of the amended complaint purport to state claims under Florida common law, Count IX seeks injunctive relief, and Count X purports to assert a claim under the Florida ADDCA. While this court has "federal question" jurisdiction over Count I's federal ADDCA claim pursuant to Title 28, United States Code, Section 1331, Pearson has not alleged independent grounds for jurisdiction over the claims arising under Florida law.[8] Thus, if this court has jurisdiction over these claims, it is pursuant to the court's power to exercise supplemental jurisdiction over the state law claims.

The Judicial Improvements Act of 1990 granted the federal district courts supplemental jurisdiction to hear claims that "are so closely related" to the claims that are within the district court's original jurisdiction that they "form part of the same case or controversy." 28 U.S.C. § 1367(a). While this provision grants federal courts jurisdiction over many pendent state law claims, the statute further provides:

> (c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

---

8. It is apparent from the face of the complaint that this court lacks diversity jurisdiction over the state law claims. Paragraph 5 of the amended complaint alleges that the plaintiff is a citizen of Florida. Paragraph 10 alleges that defendant Fort Walton Beach Lincoln–Mercury, Inc.'s principal place of business is in Florida. Paragraph 11 alleges that defendant Beal Parkway Lincoln–Mercury, Inc. currently operates the Lincoln–Mercury dealership in Fort Walton Beach, Flori-

da. For purposes of diversity jurisdiction, a corporation is a citizen of the state where it has its principal place of business. 28 U.S.C. § 1332(c)(1). Thus, both FWBLM and Beal Parkway Lincoln–Mercury, Inc. are Florida citizens. Diversity jurisdiction requires complete diversity, i.e., all defendants must be of diverse citizenship from all plaintiffs. *Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806).

(1) the claim raises a novel or complex issue of State law, [or]

\*   \*   \*   \*   \*   \*

(3) the district court has dismissed all claims over which it has original jurisdiction....

28 U.S.C. § 1367(c).

Because the only claim which provided this court original jurisdiction has been dismissed through summary judgment in favor of the defendants, I decline to exercise supplemental jurisdiction over the state law claims. The commentary to Section 1367(c)(3) explains: "[T]he idea here is once the crutch is removed—the claim that supports the supplemental jurisdiction of the other claim or claims—the other should not remain for adjudication." 28 U.S.C.A. § 1367(c)(3) Practice Commentary (West Supp.1993). *See also, Noble v. White,* 996 F.2d 797, 799 (5th Cir.1993).[9]

An even more compelling reason to decline to exercise supplemental jurisdiction is the nature of Count X. At the hearing on this matter, counsel for all parties agreed that Count X presented an issue of first impression under Florida law. It is well established that federal courts should be extremely reluctant to decide novel questions of state law. "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of the applicable law." *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218, 228 (1966). Neither the parties, nor I, have discovered any reported decision of a Florida court construing Section 320.641, *Florida Statutes,* in the context of the claim stated in Count X. "[It is not the role of a federal court to blindly speculate as to the meaning of a state statute." *Lane v. Calhoun–Liberty County Hospital Ass'n, Inc.,* 846 F.Supp. 1543, 1547 (N.D.Fla.1994). Because summary judgement has been granted on the only claim providing this court with original jurisdiction, and because the case raises novel issues of state law, I decline to exercise supplemental jurisdiction over the state law claims. Counts II, III, IV, V, VI, VII, VIII, IX, and X of the amended complaint are dismissed, without prejudice.

### III. CONCLUSION

The defendants' motion for summary judgment is GRANTED as to Count I of the amended complaint, and the Clerk shall enter judgment in favor of the defendants on Count I, without taxation of costs. The plaintiff's motion for partial summary judgment on Count I is DENIED. The remaining counts of the amended complaint are DISMISSED, without prejudice. Because I have declined to exercise supplemental jurisdiction over state law claims, the remaining motions for summary judgment are moot. Accordingly, plaintiff's motion for partial summary judgment on Count X (doc. 71), defendant's Ford Motor Credit Co.'s motion for summary judgment (doc. 77), and defendant Beal Parkway Lincoln–Mercury, Inc.'s motion for summary judgment are all DENIED as moot.

DONE AND ORDERED.

---

**9.** In the past, federal district courts have sometimes exercised jurisdiction over pendent state law claims even after the claim which provided the court with original jurisdiction was dismissed if the statute of limitations had run, and the plaintiff would, therefore, be barred from bringing his claim in state court. This is no longer a consideration. The Judicial Improvements Act of 1990 provides that the statute of limitations for any supplemental claim brought pursuant to 28 U.S.C. § 1367(a) is tolled while the claim is pending and for 30 days after it is dismissed, unless state law provides a longer tolling period. 28 U.S.C. § 1367(d).