694 So.2d 61 (1997)
Gary J. PEARSON, Individually and on Behalf of the State of Florida and the Florida Department of Highway Safety and Motor Vehicles for the Use and Benefit of Gary J. Pearson, Appellant,
v.
FORD MOTOR COMPANY, Ford Motor Credit Company, Ford Leasing Development Company, Fort Walton Beach Lincoln-Mercury, Inc., and Beal Parkway Lincoln-Mercury, Inc., Appellees.
No. 96-1066.
District Court of Appeal of Florida, First District.
April 14, 1997.
Rehearing Denied May 28, 1997.
*63 Steven B. Bauman and James W. Grimsley of Smith, Grimsley, Bauman, Pinkerton, Petermann, Saxer & Wells, Fort Walton Beach; Kenneth L. Funderburk of Funderburk, Day & Lane, Phenix City, AL, for appellant.
John H. Fleming, Patricia B. Cunningham, and Ann G. Fort of Sutherland, Asbill & Brennan, Atlanta, GA; Bruce A. McDonald of McDonald, Fleming, Moorhead & Ferguson, Pensacola, for appellees.
WOLF, Judge.
Gary Pearson appeals a final order granting final summary judgment on all counts of a ten-count complaint in favor of appellees, Ford Motor Co. (Ford), Ford Motor Credit Co. (Ford Credit), Ford Leasing Co. (Ford Leasing), and Ft. Walton Beach Lincoln-Mercury, Inc. (FWBLM). We that find material issues of fact exist precluding summary judgment as to the counts alleging breach of contract, fraud, conversion, trespass, and breach of good faith. We, therefore, reverse the order regarding these counts, but affirm as to the remaining counts of interference with corporate governance (lender liability and fraud), breach of fiduciary duty of lender liability, and violations of the Florida Automobile Dealers' Day in Court Act (Florida ADDA).[1]

FACTS
Gary J. Pearson is an African American who once was president, operator, and shareholder of FWBLM. This action arises from a number of agreements between Ford and appellant, as well as agreements between appellant and FWBLM, regarding a car dealership. As part of its efforts to increase the number of minority owners, Ford operates a dealer development program in which it assists minorities in acquiring and operating dealerships. Appellant was already employed by Ford when he filed a prospective dealer application in February 1983. Pearson and Ford entered an agreement for Pearson to participate in the dealer development program on July 12, 1983. Ford provided $320,000.00 in capital for the new dealership, and Pearson placed $80,000 in escrow for six months. During the initial six months, Pearson would operate the dealership as a salaried employee of FWBLM.
On February 1, 1984, Pearson entered into a dealer development agreement with Ford and a management agreement with FWBLM. The dealer development agreement and the management agreement were terminable at will by either party with proper *64 notice. The FWBLM board of directors was made up of Pearson and three individuals appointed by Ford. Pearson was selected to be president. Pursuant to the dealer development agreement, Ford received 1,600 shares of convertible preferred stock in FWBLM, and Pearson received 800 shares of common stock (from his $80,000 in escrow). The agreement provided that if the dealership was profitable, a portion of Pearson's share of the profits would be used to gradually purchase Ford's preferred stock in FWBLM and convert it into common stock. However, Pearson could purchase the stock only from the profits, not with any other funds. Under this plan, if the dealership was profitable under his management, Pearson would eventually own the dealership. See Pearson v. Ford Motor Co., 865 F.Supp. 1504, 1506 (N.D.Fla.1994), aff'd, 68 F.3d 1301 (11th Cir.1995).
Each year, starting in 1983 (prior to Pearson's ownership), FWBLM entered into sales and service agreements with Ford to sell Mercury and Lincoln models. The dealership was profitable in 1984, 1985, and 1986. Pearson acquired 79% of the total stock in FWBLM by the end of 1986. However, by 1988, the dealership had lost so much money that Pearson's ownership interest had declined to 34 percent of the total stock. The dealership continued to incur operating losses in 1989 and 1990.
Originally, the dealership was operated from a facility leased from the previous Lincoln-Mercury dealer. Upon expiration of this lease in 1988, the dealership relocated onto a site on Beal Parkway. Defendant Ford Leasing purchased the land, constructed the buildings, and leased the site to FWBLM. It was around this time when disputes began to arise between appellant and appellees. Ford provided the dealership with more than one million dollars in additional capitalization during the time Pearson operated it. Because of these losses, Pearson's common stock in FWBLM had no value as of the end of 1989 until the time he was terminated.
The board of directors of FWBLM voted on February 26, 1991, to terminate Pearson as president of FWBLM and operator/manager of the dealership. FWBLM provided no written notice prior to the termination of the management agreement. At the same time, Ford terminated the dealer development agreement. FWBLM continued its operations until its assets were purchased by Beal Parkway Lincoln-Mercury, Inc. in October 1991.
Pearson filed suit in federal court, alleging violations of state and federal law. Pearson, supra. The federal courts granted summary judgment, finding that appellant had no standing under the federal Automobile Dealer's Day in Court Act because appellant was not a dealer under the federal act. The federal court refused to consider the supplemental state claims.
Pearson filed a ten-count complaint in the first judicial circuit court on January 27, 1995, against Ford, FWBLM, Ford Leasing Development Co., Ford Motor Credit, and Beal Parkway Lincoln-Mercury. The trial court granted summary judgment as to all counts. A final judgment was entered as to all defendants except Beal Parkway Lincoln-Mercury. The parties stipulated that if, after appeal, there were no causes of action remaining against the Ford defendants in which there was a possibility of injunctive relief, Pearson would dismiss Beal Parkway Lincoln-Mercury as a defendant. This appeal followed.
The trial court correctly found that counts II-IV, interference with corporate governance (lender liability), interference with corporate governance (fraud), and breach of fiduciary duty (lender duty), were barred by the statute of limitations. The acts alleged supporting these counts all occurred at least four years prior to the date the complaint was filed. §§ 95.11, 95.031, Fla.Stat. (1995). We affirm the order as to these counts without further comment.

FLORIDA ADDA
We also affirm summary judgment as to count IX of the complaint, violation of the Florida ADDA. We agree with the trial court's finding that appellant was not a "motor vehicle dealer" under the Florida ADDA. Appellant alleges violation of section 320.641, unfair cancellation of franchise agreements; section 320.645, restriction upon ownership of *65 dealership by licensee; section 320.695, injunction; and section 320.697, civil damages. Section 320.641[2] requires a licensee, in this case Ford, to give written notice to the Florida Department of Highway Safety & Motor Vehicles (DHSMV) and the "motor vehicle dealer" when it intends to discontinue or modify a franchise agreement at least 90 days prior to the effective date of the change and give the reasons for the change. Appellant claims that the management agreement and dealership development agreement constitute "franchise agreements" under the definitions of the Florida ADDA, and that he is the "motor vehicle dealer" under the statutory definitions. Unfortunately, the statutory definitions are circular in that a motor vehicle dealer is one who sells pursuant to a franchise agreement, and a franchise agreement is a contract between a manufacturer and a "motor vehicle dealer." In section 320.60, "motor vehicle dealer" is defined as
"any person,[3] firm, or corporation who, for commission, money or other things of value, repairs or services motor vehicles or used motor vehicles pursuant to an agreement as defined in subsection (1), or sells, exchanges, buys, or rents, or offers, or attempts to negotiate a sale or exchange of any interest in, motor vehicles or who is engaged wholly or in part in the business of selling motor vehicles, whether or not such motor vehicles are owned by such person, firm, or corporation."[4]
§ 320.60(11)(a), Fla.Stat. (1995).
It is undisputed that appellant sold motor vehicles, and that he did so pursuant to the management agreement and the sales and service agreements. However, appellees argue that (1) the dealership, not appellant, was the dealer for purposes of the notice requirement; and (2) the dealer development agreement and the management agreement are not franchise agreements as defined by subsection section 320.60:
"Agreement" or "franchise agreement" means a contract, franchise, new motor vehicle franchise, sales and service agreement, or dealer agreement or any other terminology used to describe the contractual relationship between a manufacturer, factory branch, distributor, or importer, and a motor vehicle dealer, pursuant to which the motor vehicle dealer is authorized to transact business pertaining to motor vehicles of a particular line-make.
§ 320.60(1), Fla.Stat. (1995). The management agreement is not between Ford and appellant, but rather between FWBLM and appellant. FWBLM is not a manufacturer, factory branch, distributor, or importer. The management agreement cannot be an "agreement" under the statutory definitions, and its termination did not require notice under the statute.
Section 320.699 states in relevant part:
Administrative hearings and adjudications; procedure.
(1) A motor vehicle dealer, or person with entitlements to or in a motor vehicle *66 dealer, who is directly and adversely affected by the action or conduct of an applicant or licensee which is alleged to be in violation any provision of ss 320.60-320.70 may seek a declaration and adjudication of its rights with respect to the alleged action or conduct of the applicant or licensee....
(Emphasis added). This section distinguishes between motor vehicle dealer and persons who may own a motor vehicle dealer. The "or person with entitlement to or in a motor vehicle dealer" language is not located in any other section of the Florida ADDA.[5] Because the statutory language distinguishes between "motor vehicle dealer" and persons with entitlements in a motor vehicle dealer, we find that Pearson's role as shareholder, operator, and director did not entitle him to standing as a "motor vehicle dealer." We also find that Pearson was not entitled to notice and protections afforded to a "motor vehicle dealer" under the Florida ADDA.
Appellant argues that the prevailing view among all federal courts[6] is that when the manufacturer controls the corporate dealership, the individual shareholder should be considered the automobile dealer. See Kavanaugh v. Ford Motor Co., 353 F.2d 710 (7th Cir.1965). The 11th circuit rejected this view in Pearson, supra. Instead the Pearson court opted to follow the reasoning in York Chrysler-Plymouth, Inc. v. Chrysler Credit Corp., 447 F.2d 786 (5th Cir.1971), which recognized that generally "individuals would not come within the scope of the act merely because they were the sole stockholders, officers and directors of the corporate franchise holder." Id. at 790. Although the court in York found special circumstances justifying standing based on the contractual language, a number of other federal courts have specifically distinguished Kavanaugh and held that when a dealership is doing business in corporate form, the federal ADDA does not intend to depart from the established principle that the locus of the right of action is the corporation. Vincel v. White Motor Corp., 521 F.2d 1113 (2d Cir.1975)(holding issues of suit belonged to dealership and not owners of 100 percent of the dealership's stock); Sherman v. British Leyland Motors, Ltd., 601 F.2d 429 (9th Cir.1979)(holding dealership's president did not have standing); Milburn v. Ford Motor Co., 437 F.Supp. 7 (E.D.Okla. 1977) (finding individual shareholder did not have right of action under Dealer's Act); Rodrigue v. Chrysler Corp., 421 F.Supp. 903, 908 (E.D.La.1976); Olson Motor Co. v. General Motors Corp., 703 F.2d 284 (8th Cir.), cert. denied, 464 U.S. 894, 104 S.Ct. 240, 78 L.Ed.2d 231 (1983)(determining one not a party to the franchise agreement cannot be liable under the Dealer's Act). We reject appellant's argument that the federal ADDA is drastically different from the Florida ADDA. We find the reasoning in these federal cases to be persuasive.
We find that the trial court was correct in finding that appellant was not a "motor vehicle dealer" under the Florida ADDA and that the dealer development agreement was not a franchise agreement. Because appellant was *67 not entitled notice or relief under the Florida ADDA, summary judgment was appropriate.

BREACH OF CONTRACT
Appellant alleged in count X of his complaint that Ford failed to give Pearson written notice of termination of the dealer development agreement and FWBLM did not give appellant written notice of termination of the management agreement. He also alleged that Ford and FWBLM failed to properly compensate him pursuant to these contracts.
The complaint alleges violation of the following provisions. The management contract states in relevant part:
6. Termination. This Agreement may be terminated at will by either party, effective immediately upon the giving of written notice to the other party in accordance with the provisions of paragraph 7 hereof; provided, however, that, notwithstanding such termination, if this Agreement shall be terminated by Dealership, Dealership shall be obligated to pay to Operator the monthly salary or management fee which Operator would have been entitled to pursuant to paragraph 4 hereof, for the period ending on the date which shall be one calendar month after the giving of such notice of termination as aforesaid.
(Emphasis added). Additionally, the dealer development agreement states:
ARTICLE X. TERMINATION
10.01. Either of the parties hereto may terminate this Agreement at will at any time by giving written notice of such termination to the other party, except that with respect to obligations of the parties to be performed under this Agreement subsequent to termination thereof, this Agreement shall continue to govern. Termination of this Agreement shall become effective when notice has been properly given in accordance with Article XIX hereof.
(Emphasis added). The record shows that Ford sent a notice of termination regarding the dealer development agreement to the address in the agreement as required. Summary judgment for breach of this contract was proper. However, the complaint also alleges that FWBLM failed to supply written notice and compensation pursuant to the management agreement. The record does not reflect that FWBLM sent this notice. The trial court erred in dismissing the entire count because the record establishes material factual disputes as to how much was owed to appellant and whether FWBLM sent written notice to appellant upon termination of the management agreement.

APPLICABILITY OF STATUTE OF LIMITATIONS TO FRAUD AND BREACH OF GOOD FAITH
Appellant filed his complaint on January 27, 1995. The trial court found that the acts alleging counts I-V occurred prior to January 27, 1991, and were barred by the four-year statute of limitations. See §§ 95.11, 95.031, Fla. Stat. Under count I, fraud, appellant alleges that all acts happened before January 1991 except for the following:
F. FORD continued to make false representations to PEARSON regarding the dealership's planning volume and costs per vehicle even after FORD terminated PEARSON (viz. Exhibit 54).
I. FORD induced PEARSON to invest his money in his dealership with the promises that FORD would develop a floor plan and that its financing arm, FORD MOTOR CREDIT, would meet the special needs of PEARSON as a minority dealer by purchasing contracts from PEARSON's customers on at least an equal basis with other dealerships and in most events, on a more advantageous basis than other dealerships. In fact, FORD knew this promise to be false and proceeded throughout the period of time, commencing in 1983 and continuing through February of 1991....
The record taken in the light most favorable to appellant precludes summary judgment for the fraudulent acts which occurred after January 27, 1991.
Appellant argues, under the doctrine of continuing torts, that he is entitled to damages resulting from actions taken by appellees prior to January 27, 1991. Whether *68 the continuing torts doctrine applies to the facts of a case is for a trier of fact to decide. See Halkey-Roberts Corporation v. Mackal, 641 So.2d 445 (Fla. 2d DCA 1994) (finding complaint filed in 1991 was not barred by four-year statute of limitation when appellant alleged defendant had repeatedly used corporate funds to further his personal, political and religious interest until termination in 1989); Seaboard Air Line R.R. Co. v. Holt, 92 So.2d 169 (Fla.1956) (deciding plaintiff was entitled to recover from all injuries, not just those which accrued the three years prior to the complaint where diagnosis of skin disease was in 1947, but cause was not found until 1951).
Because appellant alleged that misrepresentations occurred prior to his termination and continued after his termination, the instant situation is much like the situation in Halkey-Roberts. Thus, whether appellant can recover from the fraudulent actions of Ford which accrued in the four years prior to filing the complaint is a question for a jury. We note that only paragraphs 65-74 of the complaint allege acts which occurred in or after January 1991 and these paragraphs only support the counts of bad faith, fraud, trespass and conversion.
In addition, count V, breach of duty of good faith, does not seem to be barred by the statute of limitations, because appellant alleges that the bad faith occurred at the February 26, 1991, board meeting terminating his management contract and by the subsequent trespass and conversion of his property. The complaint states in relevant part as follows:
95. FORD further breached its duty of good faith by wrongfully ejecting PEARSON from the business premises of FORT WALTON BEACH LINCOLN-MERCURY, INC., and by wrongfully repossessing said facility, treating the same as collateral for debts which PEARSON had incurred upon false representations made to PEARSON by FORD.... As part of said wrongful repossession of the dealership corporation and its assets, FORD further wrongfully repossessed the vehicle which PEARSON rightfully had in his possession as the President and Dealer of the dealership corporation, and wrongfully converted to FORD's own use personal property, personal papers and other personal things belonging to and owned by PEARSON, which items are unknown at this time.
96. FORD further breached its duty of good faith by breaching its contractual arrangements with PEARSON, in that FORD failed to give PEARSON prior written notice of FORD's intent to eject him from the facility and terminate PEARSON's Franchise Agreement as required by Article X of the Dealer Development Agreement.
This count should not have been barred by the statute of limitations.

CONVERSION & TRESPASS
Appellant pled the following in his complaint supporting actions for trespass and conversion:
66. PEARSON leased a storage facility at Private Mini-Storage, Unit # A019. A copy of PEARSON's lease is attached hereto as Exhibit 50. On or about February 27, 1991, FORD, without PEARSON's permission or consent, illegally broke into and entered PEARSON's storage unit and absconded with PEARSON's personal property consisting of personal papers, communications with FORD and other personal items, which items have never been accounted for or returned to PEARSON.
67. On or about February or March, 1991, FORD took possession of PEARSON's 1991 Lincoln Towncar which was rightfully in PEARSON's care and custody as the President and Dealer of FORT WALTON BEACH LINCOLN-MERCURY, INC. FORD confiscated certain personal property, including $1,000.00 in cash, belonging to PEARSON that was located in said vehicle. On April 26, 1991, PEARSON received a communication from Bruce McDonald regarding this vehicle, a copy of which is attached hereto as Exhibit 51.
68. Neither FORD nor its agents returned the $1,000.00 that was located within said vehicle to PEARSON. Therefore, either FORD or its agents converted said $1,000.00 for their own use and benefit.

*69 ....
70. On March 27, 1991, after PEARSON complained about FORD's opening his personal mail, PEARSON received a communications which essentially indicated that FORD would continue to treat PEARSON in a manner of their own choosing.
The record also contains deposition testimony and records which, taken in a light most favorable to appellant, support these claims.
Conversion is an "act of dominion wrongfully asserted over another's property inconsistent with his ownership therein." Warshall v. Price, 629 So.2d 903, 904 (Fla. 4th DCA 1993), rev. denied, 641 So.2d 1346 (Fla.1994) (quoting 12 Fla.Jur.2d Conversion and Replevin Sec. 1 (1979)). "Conversion" occurs when a person who has a right to possession of property demands its return and the demand is not or cannot be met. Shelby Mut. Ins. Co. of Shelby, Ohio v. Crain Press, Inc., 481 So.2d 501 (Fla. 2d DCA 1985), rev. denied, 491 So.2d 278 (Fla.1986). In the instant case, appellant alleges that Ford and FWBLM broke into a storage unit owned by him and took his property. Specifically, he claims that they took $1,000, but the record shows that appellees deny they or their agents took the money. Genuine issues of material fact exist as to whether there was property taken, and if so whether the property belonged to appellant. The trial court erred in granting summary judgment on the count of conversion based on its finding there was no unauthorized entry of plaintiff's property. The facts taken in the light most favorable to appellant suggest otherwise.
Trespass is an unauthorized entry onto another's property. See Florida Pub. Co. v. Fletcher, 340 So.2d 914 (Fla. 1976), cert. denied, 431 U.S. 930, 97 S.Ct. 2634, 53 L.Ed.2d 245 (1977). Consent is an absolute defense to an action for trespass. In the instant case, the court found no unauthorized entry; however, there is a dispute as to who was authorized to enter the storage unit. Appellant claims the unit was leased in his name as an individual. FWBLM claims it leased the unit because the checks paid to the lessor were from FWBLM. We find no law indicating mere payment of a lease entitles one to control of that property. Because the lease only has appellant's name and no mention of FWBLM, the facts taken in the light most favorable to appellant would preclude summary judgment.
We briefly address appellee's argument on appeal that the claims not barred by the statute of limitations are barred by the economic loss doctrine. The economic loss doctrine precludes parties to a contract to recover economic damages resulting from a breach of contract. In HTP, Ltd. v. Lineas Aereas Costarricenses, S.A., 685 So.2d 1238 (Fla.1996), the supreme court held that where a contract exists, a tort action will lie for either intentional or negligent acts considered to be independent from acts that breach the contract. More specifically, the court stated that fraudulent inducement is an independent tort, in that it requires proof of facts separate and distinct from the breach of contract; thus actions of fraudulent inducement into a contract and breach of that contract are not mutually exclusive. Johns v. Ponto, 684 So.2d 830, 831 (Fla. 2d DCA 1996). Because appellant alleges fraudulent misrepresentation and negligent misrepresentation in formation of the dealer development contract, the economic loss rule does not bar appellant's fraud action based on such misrepresentations. Also see, Wassall v. Payne, 682 So.2d 678 (Fla. 1st DCA 1996).
Appellant's count V, breach of duty of good faith, also does not seem to be solely based on breach of contract, but rather on the actions of Ford and FWBLM at the February 26, 1991, board meeting and on the trespass and conversion of his personal and private property. Inasmuch as these claims are not based on breach of contract, the economic loss rule does not preclude appellant's action for general fraud (count I) and breach of good faith (count V).
In summary, we affirm the trial court's order of summary judgment regarding counts II, III, IV, and IX, and reverse the order as to counts I, V, VI, VII, and X. We *70 remand for further proceedings consistent with this opinion.
REVERSE in part, AFFIRM in part.
JOANOS and VAN NORTWICK, JJ., concur.
NOTES
[1] This is also known as the Florida Motor Vehicle Dealer Act, §§ 320.60-320.70, Fla.Stat. (1995).
[2] 320.641. Unfair cancellation of franchise agreements, (1)(a) An applicant or licensee shall give written notice to the motor vehicle dealer and the department of the licensee's intention to discontinue, cancel, or fail to renew a franchise agreement or of the licensee's intention to modify a franchise or replace a franchise with a succeeding franchise, which modification or replacement will adversely alter the rights or obligations of a motor vehicle dealer under an existing franchise agreement or will substantially impair the sales, service obligations, or investment of the motor vehicle dealer, at least 90 days before the effective date thereof, together with the specific grounds for such action. (Emphasis added).
[3] § 320.60 (12) states:

"Person" means any natural person, partnership, firm, corporation, association, joint venture, trust, or other legal entity.
[4] § 320.60(11) excludes the following from "motor vehicle dealer":

(c) The term "motor vehicle dealer" does not include:
1. Public officers while performing their official duties;
2. Receivers, trustees, administrators, executors, guardians, or other persons appointed by, or acting under the judgment or order of, any court;
3. Banks, finance companies, or other loan agencies that acquire motor vehicles as an incident to their regular business; or
4. Motor vehicle rental and leasing companies that sell motor vehicles to motor vehicle dealers licensed under s. 320.27.
[5] Other sections of chapter 320, Motor Vehicle Licenses, also distinguish between motor vehicle dealer and individuals. For example, Florida Statute § 320.27, which requires a motor vehicle dealer to be licensed, distinguishes between the motor vehicle dealer and the applicant for the license as "applicant" or "licensee". In subsection 4(b), the statute specifically defines applicant in a parenthetical as "(owner, partner, officer of the corporation, or director)".
[6] Appellant also relies on other states' cases. Because each state's statutes are distinguishable from the Florida statute, we find these cases unpersuasive. See Cosenzi v. Springfield Lincoln Mercury Co., No. 92-388 (Mass.Super.Ct. Jan. 22, 1993) (Massachusetts statute specifically gives standing to "the individual officers, directors and other persons in active control of the activities of such entity"); Weber v. American Motors Sales Corp., No. 85 (8019) 1986 WL 9775 (N.D.Ill. Sept. 4, 1986) (Illinois statute provides remedies for anyone who suffers any loss of money or property as a result of the use or employment by a manufacturer). Also see Ford Motor Credit Co. v. Garner, 688 F.Supp. 435 (N.D.Ind.1988)( finding the corporation was the dealer and not the majority stockholder, even though there was a very close relationship between stockholder and the corporation; only dealerships were entitled to the protection of the Indiana statute); Wobb v. Ford Motor Co., 76 F.R.D. 452, 455-58 (W.D.Pa.1977)(holding minority shareholder and management employee did not have standing in his individual capacity to bring action under Pennsylvania anti-trust or ADDA statutes).