Daniel F. KAVANAUGH, also known as Dan Kavanaugh, Plaintiff-Appellee,

v.

FORD MOTOR COMPANY, a corporation, Defendant-Appellant.

No. 15003.

United States Court of Appeals Seventh Circuit.

Nov. 18, 1965.

Harvey S. Kronfeld, Dearborn, Mich., W. Donald McSweeney, Chicago, Ill., William A. Montgomery, Schiff, Hardin, Waite, Dorschel & Britton, Chicago, Ill., Richard B. Darragh, Dearborn, Mich., of counsel, for appellant.

John J. Kelly, Jr., Francis B. Stine, Chicago, Ill., for appellee.

Before SCHNACKENBERG, KILEY, and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

This is an interlocutory appeal presenting a controlling question of law within the meaning of section 1292(b) of the Judicial Code, 28 U.S.C. § 1292 (b) (1958). The question is whether plaintiff Daniel F. Kavanaugh is an "automobile dealer" and thereby entitled to sue under the Automobile Dealers' Franchise Act (commonly known as the Dealers' Day in Court Act), 15 U.S.C. §§ 1221–1225 (1956).

The Automobile Dealers' Franchise Act creates a cause of action in favor of an "automobile dealer" against an automobile manufacturer "by reason of the failure of [the] automobile manufacturer * * * to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with [the] dealer * * *." An "automobile dealer" is defined as "any person, partnership, corporation, association, or other form of business enterprise * * * operating under the terms of a franchise and engaged in the sale or distribution of passenger cars, trucks, or station wagons." A "franchise" is defined as "the written agreement or contract between any automobile manufacturer * * * and any automobile dealer which purports to fix the legal rights and liabilities of the parties to such agreement or contract."

Daniel F. Kavanaugh, as an individual, brought the instant action for damages in the district court under this statute against the Ford Motor Company.[1] A motion by Ford for summary judgment was originally denied, but was reconsidered upon a further motion which specifically raised the question of Kavanaugh's standing to sue. After reconsideration, the district court refused to vacate its order denying Ford's motion for summary judgment, but agreed to certify the question of Kavanaugh's standing to sue under the act as one involving a controlling question of law as to which substantial ground for a difference of opinion exists. This court concurred with the district court's estimation of the legal question and granted Ford's petition for leave to appeal pursuant to 28 U.S.C. § 1292(b).

---

1. Kavanaugh's complaint also contained a count alleging breach of an oral contract. This claim is not before us.

## I.

*The Ford-Kavanaugh Contractual Relationship*

The written agreements encompassing the association between Ford and Kavanaugh are contained in three distinct but necessarily related documents drafted by Ford: the "Dealer Development Contract"; the "Ford Sales Agreement"; and the "Management Contract." Each of these contracts will be outlined briefly.

1. The Dealer Development Contract.

The parties to this agreement, executed on October 3, 1958, are the Ford Motor Company and Daniel F. Kavanaugh. Kavanaugh is designated in the agreement as the "operator." The contract provides for the formation of a corporation to carry on the business of an "automobile dealership" and describes the interests to be acquired therein and the general method of operation.[2]

The agreement provides that 1500 shares of voting eight per cent cumulative, $100 par value preferred stock are to be authorized, redeemable at 110 per cent of par; Ford agrees to purchase 1200 shares, an investment of $120,000. 1500 shares of non-voting, $100 par value common stock are also to be authorized; Kavanaugh agrees to purchase 300 shares, an investment of $30,000.

An important feature of the plan for the dealership corporation envisioned by the contract is the provision for gradual transfer of the interest in the corporation from Ford to the "operator," Kavanaugh. A portion of the annual corporate profit is to be set aside for the retirement of Ford's preferred stock. Provision is also made for the gradual conversion of other preferred stock to common stock, and for its simultaneous purchase by Kavanaugh from the yearly bonus to which he is to be entitled as "operator." In general, however, although Kavanaugh's equity in the dealership corporation is designed to grow in such a gradual manner under the dealer development contract, he could not expect to acquire any voting rights at all until Ford's preferred stock is either converted or retired, that is, until Ford's equity in the corporation is reduced to zero.[3]

The contract also provides for the execution of a "management contract" between the dealership corporation and the "operator." It indicates that the parties contemplate Kavanaugh's appointment as president and a director of the corporation, but cautions that Ford is under no obligation to see that this is accomplished.

Further, the contract calls for the execution of a "sales agreement" between Ford and the dealership corporation, and adds:

Anything to the contrary herein notwithstanding, the provisions of such Sales Agreement shall be determinative of the rights of the parties thereto and neither Dealership nor Operator by virtue of this contract shall acquire any rights with respect to termination of the Sales Agreement or otherwise in addition to those provided in said Sales Agreement.

Finally, *inter alia*, the contract provides that it is terminable at the will of either party or at such time as all of Ford's preferred stock has been retired. If the termination is at will, and the business of the dealership corporation is to be continued, provision is made for the forced sale of Kavanaugh's stock to the corporation, the value of the stock to be determined by auditors

---

2. A copy of the certificate of incorporation and the by-laws of the corporation were attached to and made a part of the agreement.

3. The agreement similarly restricts Kavanaugh's power to transfer his common stock. Ford must be given an option to purchase the stock at its fair value so long as there is any preferred stock outstanding.

appointed by the corporation. In the event the stock proves worthless, Ford agrees to pay Kavanaugh one dollar.

2. The Ford Sales Agreement.

This agreement, of indefinite duration, bears the date October 8, 1958. It states that it was executed by "Dan Kavanaugh Ford, Inc." (the name given to the dealership corporation) and the Ford Motor Company.[4]

A preamble to the agreement contains a lengthy statement inserted to "facilitate an understanding of some of the provisions. * * *" This statement is deemed to be of special interest, and for that reason portions of it appear in a footnote below.[5]

The sales agreement establishes the corporation as an "authorized dealer" at retail in Ford products. All of the standard provisions relating to the operation of a Ford agency are attached to and included in the agreement.

In addition, the following recitation appears:

This agreement has been entered into by the Company with the Dealer in reliance (i) upon the repre-

---

4. Kavanaugh himself signed as president of the dealership corporation.

5. It has been demonstrated over the years that independent businessmen appointed as authorized retail dealers are best able to perform the essential functions of selling automotive products in volume sufficient to permit the industry to operate successfully, and of rendering the post-manufacturing inspection, maintenance and service necessary to the safe and satisfactory operation of motor vehicles. These authorized dealers, at their own risk, invest substantial amounts of capital in specialized sales and service facilities and arrange for financing their dealership operations and the inventories of vehicles and parts carried by their dealerships. In addition, if they are to be successful, they must provide competent management and develop and train capable sales and service personnel. In undertaking to do all of this, the authorized dealers look to the manufacturer for fair dealing and for products that can be sold in the market place. * * *

The authorized dealer is closely identified by the public with the manufacturer, and the dealer's conduct in the operation of the dealer's business has an important bearing on the good will and reputation of the manufacturer and the product. Thus, the manufacturer has a direct interest in assuring that its authorized dealers deal fairly with the public; that those dealers avoid practices that may bring discredit upon the good name and reputation of the manufacturer and other authorized dealers in the manufacturer's products. False advertising, deceptive or misleading pricing and merchandising practices, overcharging customers, misrepresenting to customers the quality or origin of parts used for repairs, charging for repair work not peformed, and other unethical practices damage the good will and good name of the manufacturer and its authorized dealers. Similarly, certain other practices, such as the wholesaling of new vehicles to unauthorized sales outlets, tend to work against the interests of authorized dealers and the public, and to injure the reputation of the manufacturer and the product. On the other hand, the adoption by the dealer of sound merchandising and business practices works to the benefit of the dealer, the manufacturer, other authorized dealers and the public.

The success of the manufacturer depends upon financially sound, responsible, efficient, vigorous and successful dealers, who have reputations for fair and honest dealing with the public. It is only proper, therefore, that the manufacturer be concerned with the sales and service performance of the dealer, his financial resources and profts, his physical facilities, his management, his sales and service personnel, his merchandising methods and his conduct toward the public. * * *

The Dealer has elected to enter into this agreement with the Company with confidence in the Company's integrity and expressed intention to deal fairly with its dealers, and with knowledge of the customer acceptance of the Company's products. The Company has elected to enter into this agreement with the Dealer with confidence in the Dealer's integrity and ability and in the Dealer's expressed intention to deal fairly with the Company and the public, and to perform and carry out the duties, obligations and responsibilities of an authorized dealer as set forth in this agreement. Because of the importance of the Dealer's success to the Company's success, the Company has selected the Dealer with great care and in reliance upon the representations of the Dealer as to the persons who shall participate in the ownership and management of the Dealer. * * *

sentation and agreement that the following person(s) substantially participate(s) in the ownership of the Dealer:

| Name | Address | Percentage of Interest |
|------|---------|------------------------|
| Daniel F. Kavanaugh | ................................... | 20% |
| Ford Motor Company | ................................... | 80% |

and (ii) upon the representation and agreement that the following person(s) shall have full managerial authority and responsibility for the operating management of the Dealer in the performance of this agreement:

| Name | Address | Title |
|------|---------|-------|
| Daniel F. Kavanaugh | ............................... | President |

Later in the agreement, Ford is given the power to terminate it, effective immediately, should a material change occur in stock ownership, in Kavanaugh's contemplated managerial position, or in the event of Kavanaugh's death as a "principal owner." [6]

### 3. The Management Contract.

The third contract was executed on October 15, 1958 between "Dan Kavanaugh Ford, Inc." and Kavanaugh himself as "operator." By its terms, Kavanaugh is employed by the corporation as its "general manager" at a salary of $1200 per month plus 25 per cent of the corporate profit. The contract, also indefinite in duration, is terminable at will by either party upon 30 days' notice.

*Factual Context of the Ford-Kavanaugh Relationship.*

To provide a clearer perspective of the Ford-Kavanaugh agreements themselves, the circumstances surrounding their execution may also be recited briefly.

For several years prior to 1958, Kavanaugh was a highly successful sales and fleet manager for the Hartigan Chevrolet dealership in Chicago. In April, 1958, he terminated his employment with Hartigan in an attempt to secure a dealership for himself. Although he was primarily interested in becoming a Chevrolet dealer, Kavanaugh was ultimately persuaded by Ford representatives to make application with Ford.

In Kavanaugh's application, he stated that he was applying for a "Ford Dealership," and included a financial statement. In answer to the printed question "How much are you prepared to invest in the company for which application is submitted?", Kavanaugh inserted "$30,000." The "District Interviewer's Comments" submitted in connection with the application made further reference to Kavanaugh's outstanding "dealer" potential.

The ensuing negotiations culminated in the execution of the documents described above in October, 1958.

The original dealership objective was the operation of a Ford agency on Ogden Avenue in Chicago. This operation met with some success during the remainder of 1958 and in 1959. Kavanaugh's equity in the dealership corpo-

---

6. The agreement contains various other provisions with respect to its termination, including a provision for termination by Ford without cause on 120 days' notice.

ration increased to 360 shares during this period, while approximately 170 shares of Ford's preferred stock were retired. A sharp decline in income occurred early in 1960, however, and in August of that year the dealership corporation was relocated in suburban Chicago through the purchase of the assets of the Park Ridge Ford agency. Kavanaugh continued to direct the activities of the dealership corporation until he was removed as president on August 29, 1962 and his management contract terminated effective immediately, by a vote of its board of directors.[7] The dealer development contract was cancelled simultaneously by Ford. An audit of the dealership corporation was conducted and Kavanaugh was tendered one dollar as the value of his stock interest.

Kavanaugh subsequently was invited to appear before Ford's "Dealer Policy Board" in Dearborn, Michigan, to present his grievances, but no changes resulted from the meeting.

## II.

Ford contends that the "sales agreement" between it and the dealership corporation is the "franchise" and that Kavanaugh is not a party to it. On this basis, Ford argues that an application of the statutory definition of the term "automobile dealer" requires the conclusion that Kavanaugh is not a dealer within the meaning of the act. In support of its argument, Ford maintains that the clear language of the act requires that a person must be a "party" in the strict legal sense to the written franchise agreement with the automobile manufacturer in order to be entitled to sue. Ford adds that such a strict construction of the statute is required because the act creates a statutory right of action not recognized by the common law.

█ Kavanaugh agrees that the issue is whether he has standing to sue under the Dealers' Day in Court Act. He contends, however, that the three written agreements (the dealer development contract, the sales agreement, and the management contract), each giving recognition to the others and each dependent upon the others, must be considered as an integrated contract, and as such a written franchise between Ford and himself which delineates their respective legal rights and duties. Kavanaugh then contends that an interpretation of these instruments, particularly in the light of the circumstances antedating their execution and the practical application of them by the parties, demonstrates that Daniel F. Kavanaugh as an individual, rather than the corporate entity Dan Kavanaugh Ford, Inc., was the "automobile dealer * * operating under the terms of a franchise."

█ We agree with plaintiff that for the purpose of answering the question presented in this case the three instruments should be considered together as an integrated agreement between Daniel F. Kavanaugh and Ford Motor Company. Each dovetails into the other. Each constitutes an inseparable part of the mutual understanding between Kavanaugh and Ford. We do not think that the word "franchise" as used in the act need be restricted to a single document. If other written agreements are so interwoven with the document ostensibly designated as the franchise as to affect materially the legal significance of the latter, they must be regarded as part of the franchise agreement.

█ With these postulates in mind we proceed to examine the three instruments to ascertain the actual relationship of the parties with respect to the Dealers' Day in Court Act. Before taking that step, two collateral factors should be noted. We are not faced with

---

7. The board of directors consisted of four members, Kavanaugh and three Ford nominees. At the meeting on August 29, only two of the directors representing Ford were present, and it was by their vote that Kavanaugh's connection with the dealership was terminated.

a claim of mistake or fraud on the part of either party. It is assumed that each intended what the instruments purport to express and to bring into being the relationship, whatever it is, that the instruments create. Secondly, the circumstances attending the execution of the agreements and the post-execution behavior of the parties are relevant considerations. Such factors, of course, may not be used to modify the agreements as written; their function is limited to aid construction.

Initially, it must be noted that Daniel F. Kavanaugh applied to Ford for an automobile dealership. Moreover, Ford in considering the application treated him as an individual applicant, not as someone applying on behalf of a corporation. The import of the circumstances leading up to the dealer development contract is that both parties considered Kavanaugh as the intended dealer.

Ford's estimation of the importance of the individual in the retail distribution of automobiles is further emphasized by its own policy declaration in the sales agreement. Ford there eulogizes the individual businessman, the independent contractor, not the corporate device, as the operational key. The preamble to the sales agreement, set out more fully in footnote 5, reads in part.

> It has been demonstrated over the years that independent businessmen appointed as authorized retail dealers are best able to perform the essential functions of selling automotive products in volume sufficient to permit the industry to operate successfully. * * * These authorized dealers, at their own risk, invest substantial amounts of capital * * * and arrange for financing their dealership operations. * * *

An obvious inconsistency exists between such a declaration and the argument presented to this court that the dealership corporation itself, substantially owned and entirely controlled by Ford, is the "automobile dealer." The inconsistency points up a necessary distinction between the dealership corporation and the individual essential to the operation of the automobile franchise.

The Ford-Dan Kavanaugh Ford, Inc. sales agreement also recites that it was entered in reliance upon the "representation and agreement" that Daniel F. Kavanaugh, the individual, would own a twenty per cent interest in the dealership and would have "full managerial authority and responsibility for the operating management" of the dealer organization. (We are required to look to the dealer development and management contracts to find this "representation and agreement.") Moreover, the sales agreement gave Ford the right to terminate the contract if Kavanaugh should not retain his interest in the dealership or if there should be any change in its operating management. Finally, it is significant that the dealership corporation was given the name "Dan Kavanaugh Ford, Inc."

It is clear from these examples that Kavanaugh was not regarded merely as someone who desired to invest in a business enterprise or as someone being employed to manage the dealership. Rather, it is obvious that Kavanaugh was deemed essential to the operation of the dealership.

Central to Ford's position is the argument that the interposition of the corporate entity between Kavanaugh and Ford must be respected and that therefore any possible cause of action under the statute belongs to the corporation. We are convinced, however, that the corporation should be disregarded in determining the question before us. Notwithstanding the fact that the corporate format may be legally unassailable in other situations, its vulnerability is exposed when the purposes of the Dealers' Day in Court Act and its legislative history are considered.

The act was prompted by abuses stemming from the disparity in bargaining power between manufacturers and their locally franchised representatives. Its fundamental purpose was "to

balance the power now weighted heavily in favor of automobile manufacturers." [8]

The position of the dealer had been such that his "franchise" agreement with the manufacturer was little short of illusory. Although his contractual freedom was undisturbed in the sense that he could initially choose whether to deal with the manufacturer or not, the dealer had practically no voice in the formulation of the contracts themselves. Many of these contracts were extremely demanding instruments, providing concurrently for termination at the will of the manufacturer, most often at the risk of the dealer's personal fortune.[9] This disparity and its attendant abuses ultimately brought congressional response, a response commanding only that the individual dealer be treated fairly and in good faith in the performance and termination of his agreements with the manufacturer.

■ It is settled doctrine that the fiction of corporate entity will be disregarded whenever it has been adopted or used to evade the provisions of a statute. Schenley Distillers Corp. v. United States, 326 U.S. 432, 437, 66 S.Ct. 247, 90 L.Ed. 181 (1946); United States v. Lehigh Valley R. R. Co., 220 U.S. 257, 272, 31 S.Ct. 387, 55 L.Ed. 458 (1911); Metropolitan Holding Co. v. Snyder, 79 F.2d 263, 266, 103 A.L.R. 912 (8th Cir. 1935).[10] For the reasons we have demonstrated, the Dealers' Day in Court Act would be subverted in the instant case if the corporate format adopted by the parties were given recognition. Hence, we must "pierce the veil" of the corporate entity and look to the substance and reality of the situation. In the interest of justice, the corporate fiction must be ignored.

■ Ford argues that the record affords no proof that the dealership corporation was created for the purpose of evading the statute. The answer is twofold. First, the totality of facts reasonably supports the inference that the corporate format was deliberately adopted in order to defeat the legislative purpose of the act. Second, regardless of intent, the format, if given recognition, effectively insulates Ford from liability under the act. It is inconceivable that Ford, owning all the voting stock of the dealership corporation and being in complete control of it, would ever seek the protection afforded by the statute. Intention is not controlling when the fiction of corporate entity defeats a legislative purpose. "The question is whether the parties did what they intended to do and whether what they did contravened the policy of the law." Anderson v. Abbott, 321 U.S. 349, 358, 64 S.Ct. 531, 536, 88 L.Ed. 793 (1944).

For the foregoing reasons, we hold that in legal contemplation Daniel F. Kavanaugh was an automobile dealer *operating* under the terms of a franchise" within the meaning of the Auto-

---

8. H.R.Rep. No. 2850, 84th Cong., 2d Sess. 2 (1956). The House Report continues: Concentration of economic power in the automobile manufacturing industry of the United States has developed to the point where legislation is required to remedy the manifest disparity in the ability of franchised dealers of automotive vehicles to bargain with their manufacturers. Investigations of the automobile industry, moreover, demonstrate a continuing trend toward greater concentration, as well as abuse by the manufacturers of their dominant position with respect to their dealers. These investigations have disclosed practices and conditions which require new legislative methods and a change in established concepts. The bill as amended proceeds from the conclusion that in the automobile industry concentration of economic power has increased to the degree that traditional contractual concepts are no longer adequate to protect the automobile dealers under their franchises. U.S.Code Congressional and Administrative News 1956, p. 4596.

9. See Kessler, Automobile Dealer Franchises: Vertical Integration by Contract, 66 Yale. L.J. 1135 (1957).

10. See generally Wormser, Disregard of the Corporate Fiction and Allied Corporation Problems (1927).

mobile Dealers' Franchise Act and that the district judge correctly denied defendant's motion for summary judgment.

The ruling is affirmed and the cause is remanded for further proceedings.

Affirmed.