**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 24, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

ERIC C. JACKSON and GREAT
BASIN COMPANIES, INC.,

       Defendants/Counter-
       Plaintiffs-Appellants,

v.

VOLVO TRUCKS NORTH
AMERICA, INC.,

       Plaintiff/Counter-
       Defendant-Appellee.

No. 04-4070

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. NO. 02-CV-27-PGC)**

Richard C. Cahoon, Durham Jones & Pinegar, Salt Lake City, Utah, for
Defendant/Counter-Plaintiffs-Appellants.

Stephen K. Christiansen (Robert S. Campbell and Robert M. Anderson with him
on the brief) Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, for
Plaintiff/Counter-Defendant-Appellee.

Before **HENRY**, **EBEL**, and **TYMKOVICH**, Circuit Judges.

**TYMKOVICH**, Circuit Judge.

Eric C. Jackson is the principal shareholder of Great Basin Companies, Inc., the parent company of various Volvo truck dealerships that operated in the West and Midwest, including Utah and Nebraska. This appeal arises out of the district court's dismissal of claims filed by Jackson and Great Basin Companies against Volvo Trucks North America, Inc. For the reasons stated below, we conclude that we have jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM the decisions of the district court.

## I. Background

In 1977, Jackson created the first of what became several related automobile dealership companies. As the dealerships grew, he would form new companies, most of which included the words "Great Basin" somewhere in the name and listed him as sole or majority shareholder. In 1983, these companies began dealing vehicles purchased from Volvo Trucks North America, Inc. (Volvo) and were initially successful in doing so. According to Jackson, by the early 1990s, the Great Basin dealerships handled approximately ten percent of all Volvo's sales in the United States, and thus, at Volvo's behest, began purchasing large quantities of vehicles from them at a substantial discount.

As the business continued to expand, opening new dealerships in various states, Jackson was expressly named the "controlling individual" or "dealer principal" of each of the Volvo dealerships and acted as guarantor of certain debts and obligations of the dealerships. Aplt. Br. at 3. He alleges that he did so based

on Volvo's promises of high returns on his investments and continued access to the profit sources upon which his dealerships depended. But Jackson believes that Volvo did not intend to keep these promises. Jackson claims that, if he had known about Volvo's plans to "eliminate virtually two-thirds of its product lines and its engine products," he would not have continued to invest in Volvo dealerships. Compl. at 11.

In February 1996, Volvo's CEO announced that half of its current dealers would not be in business by the end of the following year. Volvo executives told the dealers they wanted "larger, regional dealers who were willing to invest all they had into new territories, new equipment, larger facilities, and additional employees." *Id*. at 12. The CEO warned the dealers that "those who did not grow rapidly and substantially would simply be eliminated." *Id*.

The Great Basin dealerships heeded this warning and continued to grow and increase revenues. In 1997, with the encouragement of Volvo, Jackson purchased a dealership in Omaha, Nebraska, which became Great Basin Trucks of Nebraska, Inc. (Great Basin Nebraska). Jackson was responsible for providing $400,000 as a deposit on the purchase. According to Jackson, he and Volvo "clearly understood" the deal would include certain Ford franchises. Aplt. Br. at 4. However, after Jackson made his deposit, he learned the seller no longer possessed those franchises. Nonetheless, based upon further verbal promises of assistance and assurances of success by Volvo, Jackson went forward with the

purchase and gave up his right to rescind the purchase agreement with the seller, thereby foregoing his deposit.

By 1999, the Great Basin operations controlled Volvo dealerships in seven states. Their revenues grew from $25 million to almost $300 million per year. However, during this growth period, their total debt also grew from $5 million to over $60 million. In June 2000, all of the Great Basin entities became wholly owned subsidiaries of a newly created parent company, Great Basin Companies, Inc. During the remainder of 2000, Jackson and Great Basin Companies held ongoing negotiations with Volvo for the sale of the Nebraska dealership. Great Basin Companies alleges it would not have continued to hold the Nebraska dealership during that period but for the promises of purchase made by Volvo.

Experiencing substantial losses in 2000 and 2001, most of Great Basin Companies' dealerships filed for bankruptcy. Volvo purchased the primary assets of the bankrupt dealerships from the individual trustees in bankruptcy. The deal included an agreement by the trustees to settle, waive, or release all claims the individual dealerships may have had against Volvo.

On January 10, 2001, Volvo's finance arm, Volvo Commercial Finance, LLC (Volvo Finance), filed suit against Jackson, Great Basin Companies, and related parties over an alleged breach of a $1.3 million loan agreement. Jackson and Great Basin Companies responded by filing their own claims against Volvo and Volvo Finance based on conduct surrounding the loan agreement and other

alleged wrongful acts.

In two separate 12(b)(6) rulings and one summary judgment ruling, the district court disposed of a number of these claims. Jackson and Great Basin Companies appeal the following dispositions. First, Jackson appeals the court's Rule 12(b)(6) dismissal of his cause of action arising under the Automobile Dealers' Day in Court Act. Second, Jackson and Great Basin Companies appeal the court's decision to grant summary judgment for Volvo on Jackson's fraud, promissory estoppel, and negligent misrepresentation claims, as well as Great Basin Companies' separate promissory estoppel claim.[1]

After Jackson and Great Basin Companies filed a notice of appeal, the district court issued a separate order adopting a stipulation of the parties to dismiss with prejudice (1) all claims by and against Volvo Finance and (2) all unresolved claims by Jackson and Great Basin Companies against Volvo. This last order resolved the remaining issues in the case.

## II. Discussion

### A. Jurisdiction

We must first consider whether Jackson and Great Basin Companies have

---

[1] Jackson and Great Basin Companies also initially appealed the court's 12(b)(6) dismissal of their claim of inducement to breach fiduciary duty. However, they withdrew their appeal of this issue at oral argument on the basis that they had lost their direct breach of fiduciary duty claim. Without a breach of fiduciary duty, they concluded, it was impossible to establish inducement to breach.

appealed a "final" judgment from the district court that is ripe for our review. 28 U.S.C. § 1291. As a general matter, a judgment in a consolidated action that does not dispose of all claims is not considered a final appealable decision under § 1291. *Trinity Broadcasting Corp. v. Eller*, 827 F.2d 673, 675 (10th Cir. 1987). Volvo argues that, because Jackson and Great Basin filed their notice of appeal while other claims remained pending in the case, and because they failed to cure that defect by obtaining certification under 54(b) of the Federal Rules of Civil Procedure, we should decline to entertain the appeal. However, where parties appeal non-final orders, the court's subsequent issuance of an order "explicitly adjudicating all remaining claims" may cause a case to ripen for appellate review. *Lewis v. B.F. Goodrich Co.*, 850 F.2d 641, 645 (10th Cir. 1988) (en banc) (exercising appellate jurisdiction where plaintiffs sought and obtained subsequent court order disposing of outstanding claim). As noted above, this is exactly what happened here.

But to further complicate things, Volvo points out that one of Jackson and Great Basin's claims—civil conspiracy—was dismissed *without prejudice to refiling*. Thus, even though that claim was not appealed, Volvo argues the judgment below is still non-final for purposes of our review. Our general rule is that a party cannot obtain appellate jurisdiction where the district court has dismissed at least one claim without prejudice because the case has not been fully disposed of in the lower court. *See Heimann v. Snead*, 133 F.3d 767, 769 (10th

Cir. 1998) (applying *Cold Metal Process Co. v. United Engineering & Foundry Co.*, 351 U.S. 445 (1956)); *Cook v. Rocky Mtn. Bank Note Co.*, 974 F.2d 147, 148 (10th Cir. 1992). That rule does not apply in every circumstance, however. We have previously held, "Although a dismissal without prejudice is usually not a final decision, where the dismissal finally disposes of the case so that it is not subject to further proceedings in federal court, the dismissal is final and appealable." *Amazon, Inc. v. Dirt Camp, Inc.*, 273 F.3d 1271, 1275 (10th Cir. 2001) (holding district court's decision to decline supplemental jurisdiction and dismiss state claims without prejudice for refiling in state court effectively disposed of entire action).

The "critical determination" here is whether Jackson and Great Basin have been "effectively excluded from federal court under the present circumstances." *Id.*

Under Utah law, civil conspiracy requires, as one of its essential elements, an underlying tort. *See Alta Indus. Ltd. v. Hurst*, 846 P.2d 1282, 1290 n.17 (Utah 1993). Although the district court dismissed Jackson and Great Basin's civil conspiracy claim without prejudice, it dismissed their underlying tort claims *with prejudice*. Thus, practically speaking, Jackson and Great Basin Companies are barred from further litigation on the conspiracy claim because they cannot litigate the predicate torts. They thereby fall within the *Amazon* exception.

Accordingly, the case is ripe for appellate consideration.

**B. The Automobile Dealers' Day in Court Act**

Jackson filed suit against Volvo under the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221, et seq. (ADDCA). That statute authorizes any "automobile dealer" to file federal claims against manufacturers arising from franchise relationships. The question here is whether Jackson qualifies as a dealer and is therefore authorized to sue under the statute.

Three provisions of the ADDCA guide our analysis. The first establishes a cause of action:

> An automobile dealer may bring suit against any automobile manufacturer . . . by reason of the failure of said automobile manufacturer . . . to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer . . . .

15 U.S.C. § 1222. Standing is thus limited to an "automobile dealer," which is defined as

> any person, partnership, corporation or association, or other form of business enterprise . . . *operating under the terms of a franchise* and engaged in the sale or distribution of passenger cars, trucks, or station wagons.

15 U.S.C. § 1221(c) (emphasis added). A "franchise" is, in turn, defined as

> the written agreement or contract between any automobile manufacturer engaged in commerce and any automobile dealer which purports to fix the legal rights and liabilities of the parties to such agreement or contract.

15 U.S.C. § 1221(b).

Based on the plain language of the statute, an automobile dealer must be a

party to a franchise agreement with the manufacturer, in this case Volvo. Jackson concedes that he was not. Nonetheless, Jackson asks us to carve out an exception to the plain language of the statute because his personal economic interests are "inextricably woven" into Great Basin Companies' corporate interests. He urges us to follow two cases from the Fifth and Seventh Circuits that have interpreted the ADDCA to confer standing on shareholder/operators in certain circumstances. We decline to do so.

First, Jackson points us to *Kavanaugh v. Ford Motor Co.*, 353 F.2d 710 (7th Cir. 1965). In that case, Ford Motor Company entered a franchise agreement with a dealership corporation in which it owned 100 percent of the voting stock. Kavanaugh was a signatory to the franchise agreement and was given full managerial responsibility over the dealership. After the franchise began losing money and the dealership's stock became worthless, Kavanaugh sued under the ADDCA. The Seventh Circuit decided that, because Ford Motor Company owned all of the voting stock in the dealership corporation, it would be absurd to assume it would agree to initiate an ADDCA claim against itself. Thus, the only way for the dealership to avail itself of the protections of the Act would be to "pierce the corporate veil" and allow Kavanaugh to protect the dealership's interests.

The facts of the *Kavanaugh* case are not before us today, and thus we need not decide whether to adopt its reasoning. The Seventh Circuit chose to extend the protections of the ADDCA to an individual who was a signatory to the franchise

agreement and was therefore arguably "operating under the terms of a franchise."

*See id.* at 717 (quoting 15 U.S.C. § 1221(c)).  By contrast, Jackson admits he "did

not personally sign the franchise agreement."  Aplt. Br. at 7.  In addition, the

Seventh Circuit's analysis was driven in large part by its recognition that

Kavanaugh was the *only* person or entity who could have pursued an action against

the manufacturer under the ADDCA.  *Kavanaugh*, 353 F.2d at 717 ("It is

inconceivable that Ford, owning all the voting stock of the dealership corporation

and being in complete control of it, would ever seek the protection afforded by the

statute.")  Here, Volvo did not control the operations of the Great Basin

corporations and thus could not have completely precluded them from making the

decision to sue.  Indeed, most of the corporations (which Jackson controlled) chose

to use that right as a bargaining tool during the liquidation process.[2]  *Compare*

*Vincel v. White Motor Corp.*, 521 F.2d 1113, 1120 (2d Cir. 1975) (finding "no

justification for allowing the shareholders . . . to maintain an action in their own

name" where the corporation "explicitly relinquished" its claims in bankruptcy

proceedings).  These critical differences render the reasoning of *Kavanaugh*

inapplicable to this case.

---

[2] Jackson filed a supplemental authority asking us to take "judicial notice" of the fact that one of the Great Basin entities neither exercised its right to sue under the ADDCA nor bargained it away but is now precluded from filing a claim because the statute of limitations has passed.  This issue has not been properly presented to us on appeal, and we decline to consider it.  The only ADDCA claim pending on appeal is the one filed by Jackson; the status of a claim never filed by a separate party is irrelevant to our resolution of this case.

The second case on which Jackson heavily relies is *York Chrysler-Plymouth, Inc. v. Chrysler Credit Corp.*, 447 F.2d 786 (5th Cir. 1971). In *York*, the Fifth Circuit purported to adopt the reasoning of *Kavanaugh*. *See id.* at 790. However, the analysis was quite different. In that case, the Yorks operated dealership corporations pursuant to an agreement with the manufacturer, Chrysler. At the outset, the court recognized that the Yorks were "not signing parties to the franchise agreement." *Id.* Moreover, the Yorks, rather than Chrysler, maintained "control of the stock of the dealership corporation," *id.*, so there was no reason to suspect the manufacturer could prohibit the corporation from filing suit as it did in *Kavanaugh*. Nonetheless, the Fifth Circuit allowed the Yorks to pursue individual claims against Chrysler under the ADDCA on the grounds that they were "inextricably woven" into the franchise relationship. *Id.* The court noted that the "individuals would not come within the scope of the Act merely because they were sole stockholders, officers, and directors of the corporate franchise holder." *Id.* However, the unique position held by these individuals was demonstrated by the fact that Chrysler was explicitly given the power to terminate the franchise agreement if either of the Yorks died or failed to maintain active management of the corporation or were convicted of certain crimes. *Id.* at 790–91. Thus, because the court deemed the Yorks "essential to operation of the dealership" by Chrysler, they were granted standing under the ADDCA. *Id.* at 790.

Jackson argues that we should adopt the reasoning of *York* and apply it to his

-11-

case because he was the principal or sole shareholder of each of the Great Basin subsidiaries and was heavily involved in the negotiations for Volvo dealership agreements. Therefore, he alleges, he too was "inextricably woven" into the business arrangements and "essential to the operation" of the various dealerships.

This is a question of first impression for our circuit.[3] As a preliminary matter, we note that most other circuits have expressly refused to carve out exceptions to the ADDCA. *See Bishay v. Am. Isuzu Motors, Inc.*, 404 F.3d 491 (1st Cir. 2005) (construing analogous statute and rejecting *York*); *Vincel v. White Motor Corp.*, 521 F.2d 1113, 1120 (2d Cir. 1975) (distinguishing *York* and *Kavanaugh*); *Tucker v. Chrysler Credit Corp.*, 149 F.3d 1170, *4 (4th Cir. 1998) (unpublished) (rejecting *York*); *Olson Motor Co. v. General Motor Corp.*, 703 F.2d 284, 289 n.5 (8th Cir. 1983) (distinguishing *York*); *Sherman v. British Leyland Motors*, 601 F.2d 429, 440 n.11 (9th Cir. 1979) (rejecting *York*); *Pearson v. Ford Motor Co.*, 68 F.3d 1301, 1303 (11th Cir. 1995) (distinguishing *York*). *But see Rea v. Ford Motor Co.*, 497 F.2d 577, 584 (3d Cir. 1974) (applying *York*).

We agree with the majority position. The text of the statute plainly cuts against Jackson. Where a statute is unambiguous on its face, the court need not inquire further. *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992).

---

[3] Despite Jackson's suggestion to the contrary, we have not yet considered this issue. In *Colonial Ford, Inc. v. Ford Motor Co.*, 592 F.2d 1126, 1129 (10th Cir. 1979), we cited *York* for its plain language interpretation of the term "manufacturer," not the exception to the plain language that *York* created for the term "dealer."

Moreover, where parties choose the corporate form and receive all the benefits that flow from that structure, we should be hesitant to ignore the consequences. Jackson has not alleged an "alter ego" theory, nor has he argued that we should pierce the corporate veil of the Great Basin entities to expose the shareholders to personal liability. He has not made this argument for good reason: to do so would risk exposing his own assets to creditors of the bankrupt corporations. In short, we see no reason to depart from the plain language of the ADDCA and therefore decline to extend its application to those who do not qualify as "dealers" under the Act.

Accordingly, we dismiss Jackson's ADDCA claim for lack of statutory standing.

## C. State Law Claims

Last, Jackson and Great Basin Companies appeal the district court's dismissal of four state law claims. These include three claims brought by Jackson (fraud, promissory estoppel, and negligent misrepresentation) and a separate claim brought by Great Basin Companies (promissory estoppel). The district court granted summary judgment against Jackson and Great Basin Companies on the basis that they failed to show an actual injury and therefore lacked standing for purposes of federal court jurisdiction. We agree that summary judgment was appropriate but for slightly different reasons than those articulated below.

### 1. Constitutional Standing

In granting summary judgment, the district court considered the state law claims in terms of constitutional standing. As the court correctly pointed out, a party pursuing an action in federal court must meet the requirements of Article III standing: (1) injury in fact that is (2) traceable to the defendant and (3) redressable by the court. *Essence, Inc. v. City of Fed. Heights*, 285 F.3d 1272, 1280 (10th Cir. 2002) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). An "actual or imminent" injury must be present for a party to proceed on its claims. *Id.*

The purpose of the standing inquiry is not to determine whether a party has *proven* its case but to gauge whether it should be granted access to the federal courts. The focus of the injury element is on ensuring a legitimate dispute between the parties. *See Lujan*, 497 U.S. at 883 (denying standing to challenge environmental policy because plaintiffs' allegations that they used land in the vicinity of affected areas did not establish a connection between them and the proposed government action). A plaintiff who is personally harmed has a stake in the litigation and is not a mere intermeddler. *See Sierra Club v. Morton*, 405 U.S. 727, 739 (1972) (denying standing to prevent construction of ski resort because general environmental concerns were not sufficient to demonstrate these plaintiffs would be personally affected by the project). For this reason, the issue generally arises in the constitutional or public law context and is rarely implicated in private civil disputes.

No one disputes that Jackson and Great Basin Companies have personal stakes in these private contractual disputes or that the alleged injuries were to them, as opposed to other parties. The district court merely concluded they had failed to show disputed facts concerning their alleged losses—a determination more properly understood as a failure to meet Rule 56's requirement that controverted material facts are necessary in order to proceed to trial. Consequently, although Jackson and Great Basin Companies may have standing to pursue claims in federal court, their claims must still withstand analysis under the traditional summary judgment standards. The state law claims do not meet this test.

## 2. Summary Judgment

When a party moves for summary judgment, it will be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Plaintiffs seeking to overcome a motion for summary judgment may not "rest on mere allegations" in their complaint but must "set forth *specific* facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e) (emphasis added). Here, the record conclusively establishes that Jackson and Great Basin Companies did not suffer the injuries they alleged. Without this essential element, each of their claims necessarily fails, and summary judgment was properly entered.

### a. Jackson

Jackson has based all his appealed state law claims (fraud, promissory estoppel, and negligent misrepresentation) on the alleged loss that resulted from his investment in Great Basin Nebraska. Jackson created this corporate entity to purchase a dealership in Nebraska, for which he paid a $400,000 deposit for stock in Great Basin Nebraska. Jackson alleges that, after discovering the investment did not include everything originally anticipated, he would have rescinded his deposit under the purchase agreement. He claims that based on assurances from Volvo, he chose to go forward with the agreement and thus gave up his right to the return of his $400,000 deposit.

Having thoroughly examined the parties' arguments and accompanying record evidence, we agree with the district court that Jackson has not demonstrated a genuine issue of material fact as to his alleged damages. In the summary judgment proceedings, Volvo argued Jackson's investment actually earned him a profit. In particular, Volvo pointed out, and Jackson conceded, that there was no evidence of an investment in Great Basin Nebraska beyond the $400,000 deposit. But Jackson's investment entitled him to ownership of one hundred percent of Great Basin Nebraska's stock, of which he subsequently sold two thirds to other investors for $1,000,000 and exchanged the remaining third for shares in Great Basin Companies. Based on this record evidence, the district court concluded that Jackson suffered no injury in fact. To the contrary, his investment resulted in a net gain of at least $600,000, instead of a loss.

On appeal, Jackson does not challenge this finding by the district court. His opening brief focuses on the $400,000 investment and on his decision to give up his right to rescind the agreement, but he fails to address the $1,000,000 cash and additional stock he subsequently received. His reply brief addresses (for the first time) the findings issued by the district court. He concedes he exchanged stock in Great Basin Nebraska for stock in Great Basin Companies but does not acknowledge the shares that he sold. Instead, Jackson spawns a new theory—that his alleged loss is based on some undisclosed amount by which his stock decreased in value subsequent to his investment. It is unclear whether he is referring to stock he previously owned in Great Basin Nebraska or stock he subsequently received from Great Basin Companies. If the former, the facts do not support his claim because he sold part of his interest at a higher price than he paid. If the latter, the decrease in value would be irrelevant because, even if the stock he received in trade was worthless, he would still have made a $600,000 gain on the investment in Great Basin Nebraska, which he alleges he would have rescinded.

Accordingly, we conclude Jackson has failed to demonstrate a genuine issue of material fact with regard to his alleged loss and Volvo is entitled to summary judgment on these claims.

### b. Great Basin Companies

Similarly, Great Basin Companies' promissory estoppel claim requires a showing of disputed facts relating to its alleged economic harm. Great Basin

-17-

Companies claims Volvo promised to purchase the Nebraska dealership but then failed to do so. As a result of Great Basin Companies' continued holding of the dealership, it incurred loss in the form of an increased inter-company loan balance.

According to Great Basin Companies, it purchased Great Basin Nebraska on June 30, 2000, and relinquished it six months later, on December 31, 2000. According to the record, the relevant monthly inter-company loan balances were as follows:

| | | |
|---|---|---|
| June | 2000 | $6,582,853.10 |
| July | 2000 | $6,222,048.96 |
| December | 2000 | $6,545,871.24 |

Aplt. App. at 1018. In its briefs, Great Basin Companies asserts that the figures for June and July represented the balances at the *beginning* of each month but that the figure for December represented the balance at the *end* of the month. Thus, Great Basin Companies claims the recorded July balance, $6,222,048.96, represented the balance on July 1, which most closely aligns with the date they purchased the stock, June 30. Great Basin Companies also alleges, however, the December balance, $6,545,871.24, represents the balance as of December 31, which was the date it relinquished the stock. Thus, it concludes, the record shows an increased loan balance of $323,822.28.

In addition to presenting an inconsistent method of interpretation, Great Basin Companies' argument contradicts its own testimony on the subject. According to the deposition testimony of Al Vanleewen, Great Basin Companies' chief financial

officer, the numbers represent the loan balance as of month end. Thus, the amount listed under June 2000 is the balance as of the date Great Basin Companies acquired the Nebraska dealership on June 30, 2000. Calculating the numbers correctly, the loan balance on June 30, 2000 (the day Great Basin Companies acquired stock in the Nebraska dealership) was $6,582,853.10. The loan balance on December 31, 2000 (the date Great Basin Companies relinquished its stock) was $6,545,871.24. Based on Mr. Vanleewen's testimony, the amount Great Basin Companies owed actually *decreased* by $36,981.86 during the relevant period. Accordingly, Great Basin Companies cannot show that it incurred loss in the form of increased debt. Summary judgment was therefore proper because Great Basin Companies can show no damages under its promissory estoppel claim.

Accordingly, while we apply a different legal framework than the district court, we affirm the result reached below.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's decisions disposing of the above claims by Jackson and Great Basin Companies against Volvo.