**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0741n.06
Filed: October 5, 2006

No. 05-5458

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| PAUL F. CARUANA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| | ) | MIDDLE DISTRICT OF TENNESSEE |
| GENERAL MOTORS CORPORATION, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

Before: COOK, McKEAGUE, Circuit Judges, and WILHOIT, District Judge.[*]

COOK, Circuit Judge. Paul Caruana was the sole shareholder and operator of a General Motors dealership, Tennessee Motors, Inc., until March 2001, when financial setbacks caused him to sell a majority interest to several investors. Caruana then sued Defendants General Motors Corporation ("GM"), General Motors Acceptance Corporation ("GMAC"), and several additional defendants under, among other things, the Automobile Dealers' Day in Court Act ("ADDCA") and the federal antitrust laws. GM moved to dismiss Caruana's ADDCA and antitrust claims for lack of standing. The district court denied GM's motion, but certified these standing questions for

---

[*] The Honorable Henry R. Wilhoit, Jr., United States District Judge for the Eastern District of Kentucky, sitting by designation.

interlocutory appeal, which this court accepted.   We hold Caruana lacks standing under both the ADDCA and federal antitrust laws.

I.

Caruana owned all the stock and also managed Tennessee Motors, a GM dealership.  To stimulate sales, Caruana adopted a full disclosure, consumer-oriented approach known as "invoice price selling" and thereby sold significantly more cars than anticipated.  Caruana claims that other dealers, struggling to compete with Caruana's low pricing, complained to GM, who bowed under the dealers' pressure and retaliated against Caruana and Tennessee Motors by (1) refusing to ship vehicles to Tennessee Motors, (2) refusing to fill orders for sold vehicles, and (3) providing inadequate support and assistance.

Caruana also claims that GMAC followed GM's lead in applying pressure by its refusal to provide financing to Caruana's customers on the same terms under which it financed other dealers' customers.  When GMAC also demanded that Caruana infuse $275,000 cash into Tennessee Motors—which it could do because Caruana was "out of trust" with GMAC as a result of comptroller theft—or it would terminate Tennessee Motors's financing, Caruana sold part of his interest in Tennessee Motors to several investors to raise the cash.  Caruana now holds only a 32% interest in the company and no longer manages the dealership. According to Caruana, GM intended this result when it made financial demands on him that it knew he could not meet and otherwise

discriminated against him. Also, Caruana claims that GM and GMAC conspired with the investors who purchased equity in Tennessee Motors.

Caruana sued GM, GMAC, and several of the investors. The Defendants moved to dismiss under Fed. R. Civ. P. 12(b)(6). Relevant to this appeal, the district court denied GM's motion to dismiss Caruana's claims under both the ADDCA and federal antitrust laws, concluding that Caruana had standing to pursue his claims. We review the standing questions pursuant to 28 U.S.C. § 1292(b).

## II.

"To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory. Nonetheless, conclusory allegations . . . will not suffice to prevent a motion to dismiss." *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005) (internal citation omitted). We review such judgments de novo. *Id.*

### A. Automobile Dealers' Day in Court Act

GM first contests the district court's determination that Caruana has standing to pursue his ADDCA claims. Because the Act provides a cause of action for an "automobile dealer" when an "automobile manufacturer" fails to act in good faith in carrying out a franchise agreement, we must consider whether Caruana himself is an "automobile dealer," the district court having concluded that

Caruana could not maintain a derivative claim. 15 U.S.C. §§ 1221–1225; *see id*. § 1222. An "automobile dealer" is "any person, partnership, corporation, association, or other form of business enterprise . . . operating under the terms of a franchise and engaged in the sale or distribution of passenger cars, trucks, or station wagons." *Id.* § 1221(c). A "franchise" is "the written agreement or contract between any automobile manufacturer engaged in commerce and any automobile dealer which purports to fix the legal rights and liabilities of the parties to such agreement or contract." *Id.* § 1221(b).

Caruana argues that he qualifies as an "automobile dealer" by virtue of his being a party to the franchise agreement, which emphasized his personal role. He highlights the clause designating the agreement as a "Personal Services Agreement, entered into . . . on Dealer's assurance that Dealer Operator will provide personal services by exercising full managerial authority over Dealership Operations." To show that he and his dealership were essentially indistinguishable, Caruana notes that he signed the agreement on behalf of Tennessee Motors, he was the "Dealer Operator" referred to in the agreement, and GM could terminate the franchise agreement if Caruana became incapacitated. Yet the contract delimits Tennessee Motors as the "only party to [the] Agreement with General Motors," and Tennessee law instructs that we construe the contract "according to its plain terms." *Pitt v. Tyree Org. Ltd.*, 90 S.W.3d 244, 252 (Tenn. Ct. App. 2002) (citations omitted).

Caruana also contends that he qualifies as a dealer because he is "an intended third party beneficiary of the Agreements." Under Tennessee law, however, a third party may enforce a contract

only if, among other things, the parties have not otherwise agreed. *Owner-Operator Indep. Drivers Ass'n, Inc. v. Concord EFS, Inc.*, 59 S.W.3d 63, 70–71 (Tenn. 2001). The franchise agreement provides, "This Agreement is not enforceable by any third parties and is not intended to convey any rights or benefits to anyone who is not a party to this Agreement." Caruana thus may not assert the rights of Tennessee Motors as a third party beneficiary.

Caruana essentially seeks to sue as a shareholder for the corporation's injuries. In this circuit, individual shareholders, even sole shareholders, generally do not have standing under the ADDCA to sue for the corporation's injuries. As we explained in *Dienstberger v. General Motors Corp.*, No. 94-4336, 1995 WL 559374, at *1 (6th Cir. Sept. 20, 1995) (unpublished opinion), a plaintiff who sues "in his sole capacity as a shareholder . . . lacks standing to challenge [the manufacturer's] action. Only the corporate entity . . . could sue [the manufacturer] . . . ." *Dienstberger* applied the well-established doctrine, articulated in *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals., Inc.*, 862 F.2d 597, 602–03 (6th Cir. 1988), that shareholders and officers of a franchisee lack standing to sue the franchisor for the franchisee corporation's injuries. The district courts in this circuit apply this rule to ADDCA claims, and we see no reason here to depart from it. *See*, *e.g.*, *Salem Mall Lincoln Mercury, Inc. v. Hyundai Motor Am.*, No. C-3-95-231, 1998 WL 1572766, at *3 (S.D. Ohio Aug. 18, 1998) ("When the dealership is doing business in the corporate form, 'the statute contains no hint that it intends a departure from the established principle that the locus of the right of action is the corporation.'" (quoting *Vincel v. White Motor Corp.*, 521 F.2d 1113, 1120 (2d Cir. 1975)); *Hagen v. Gen. Motors Corp.*, No. C-1-75-321, 1976 WL 1304, at *2 (S.D. Ohio Aug. 27, 1976).

No. 05-5458
*Caruana v. Gen. Motors Corp.*

Many of our sister circuits apply this standing limitation without exception. *See, e.g.*, *Tucker v. Chrysler Credit Corp.*, No. 97-1364, 1998 WL 276266, at *4 (4th Cir. May 29, 1998); *Pearson v. Ford Motor Co.*, 68 F.3d 1301, 1303 (11th Cir. 1995); *Olson Motor Co. v. Gen. Motors Corp.*, 703 F.2d 284, 289–90 (8th Cir. 1983); *Sherman v. British Leyland Motors*, *Ltd.*, 601 F.2d 429, 439–40 (9th Cir. 1979); *Vincel*, 521 F.2d at 1120.

Several circuits have recognized exceptions to the rule against shareholder standing, and Caruana argues that his case fits one of these exceptions. In *Kavanaugh v. Ford Motor Co.*, 353 F.2d 710, 716 (7th Cir. 1965), the Seventh Circuit allowed a shareholder of a franchisee corporation to sue Ford because the corporation was "substantially owned and controlled by Ford." This relationship, the court reasoned, "effectively insulates Ford from liability under the act." *Id.* at 717. The Seventh Circuit relied on the "settled doctrine that the fiction of corporate entity will be disregarded whenever it has been adopted or used to evade the provisions of a statute." *Id.* Caruana alleges no such facts regarding his adoption of the corporate form. Later analysis of *Kavanaugh* has essentially limited it to situations where the manufacturer also owns a controlling interest in the dealership. *See Salem Mall*, 1998 WL 1572766, at *4 (rejecting plaintiffs' reliance on *Kavanaugh* as misplaced when they made no showing that the manufacturer "forced" the corporate form on them or that the manufacturer controlled the dealership); *see also Vincel*, 521 F.2d at 1120 ("the circumstances in [*Kavanaugh*] which induced the court to disregard the corporate entity were compelling").

- 6 -

Caruana also urges us to adopt the exception articulated by the Fifth Circuit in *York Chrysler-Plymouth v. Chrysler Credit Corp.*, 447 F.2d 786 (5th Cir. 1971). In *York*, the Fifth Circuit recognized that "individuals would not come within the scope of the Act merely because they were sole stockholders, officers and directors of the corporate franchise holder," *id.* at 790, but because the franchisees in *York* "were so inextricably woven" into the franchise agreement, the court granted them standing. *Id.* This reasoning, however, fails to respect the plain language of the ADDCA. As the court in *Salem Mall* explained, "the *York* court misinterpreted the holding in the . . . *Kavanaugh* decision, in reaching a conclusion that 'essential' persons—or as the Plaintiffs characterize it, those persons having a 'personal commitment'—enjoy an exception to the plain language of the ADDCA." 1998 WL 1572766, at *5. The district court in this case followed *Salem Mall* in correctly rejecting Caruana's reliance on *York*, in keeping with several circuits that have criticized or declined to follow *York. See, e.g.*, *Tucker*, 1998 WL 276266, at *4; *Pearson*, 68 F.3d at 1303; *Olson Motor Co.*, 703 F.2d at 289 n.5; *Sherman*, 601 F.2d at 440 n.11; *Vincel*, 521 F.2d at 1120.

The district court also discussed and relied on *Imperial Motors, Inc. v. Chrysler Corp.*, 559 F. Supp. 1312 (D. Mass. 1983), in determining Caruana's standing. Although *Imperial Motors*'s facts resemble those in this case, *Imperial Motors* relied on *York* and *Kavanaugh* in permitting plaintiff suits beyond the purview of the plain language of the statute, *id.* at 1314–15, and as previously discussed, we find these extensions unsupported by the ADDCA.

Caruana bemoans 12(b)(6) dismissal as denying him the opportunity to present facts establishing his standing to sue under the Act. Such dismissals require courts to accept all factual allegations contained in the complaint as true and "determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993) (citing *Meador v. Cabinet for Human Res.*, 902 F.2d 474, 475 (6th Cir. 1990)). Though Caruana alleges in his complaint that he is an "automobile dealer" as defined by the ADDCA, this allegation is a legal conclusion, and "we need not accept as true legal conclusions or unwarranted factual inferences." *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987). Without allegations of fact to support "dealer" status, 12(b)(6) dismissal fits.

We hold that the district court erred by permitting Caruana to assert claims under the ADDCA.

## B. Antitrust Standing

Caruana asserts several antitrust claims under the Sherman Act, 15 U.S.C. § 1, the Clayton Act, 15 U.S.C. § 15, and the Robinson-Patman Act, 15 U.S.C. § 13. In essence, Caruana claims that Defendants GM, GMAC, and some other unknown individuals conspired to engage in a resale-price-maintenance scheme to harm Tennessee Motors and end its practice of "invoice price selling." Caruana's right to proceed hinges on his ability to overcome challenges to his standing under the antitrust laws. Antitrust plaintiffs must prove more than economic injury; they "'must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows

from that which makes the defendants' acts unlawful.'" *Valley Prods. Co. v. Landmark, A Div. of Hospitality Franchising Sys., Inc.*, 128 F.3d 398, 402 (6th Cir. 1997) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). This heightened standard obtains because the antitrust laws "were enacted for 'the protection of competition, not competitors.'" *Brunswick*, 429 U.S. at 488 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)). Schooled by the Supreme Court's articulation of factors relevant to antitrust standing in *Associated General Contractors of California Inc. v. California State Council of Carpenters*, 459 U.S. 519, 537–45 (1983), this circuit then adopted that formulation:

> (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation.

*Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1085 (6th Cir. 1983) (citing *Associated Gen. Contractors*, 459 U.S. at 537–45). "All five factors must be balanced, however, with no one factor being determinative." *Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972, 976 (6th Cir. 2000). Nonetheless, "[t]he Sixth Circuit, it is fair to say, has been reasonably aggressive in using the antitrust injury doctrine to bar recovery where the asserted injury, although linked to an alleged violation of the antitrust laws, flows directly from conduct that is not itself an antitrust violation." *Valley Prods.*, 128 F.3d at 403. With these guidelines in mind, we assess the *Southaven*

factors as they apply to this case.

We first examine "the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused." *Southaven*, 715 F.2d at 1085. As the district court aptly observed, "The majority of the antitrust violations averred by Caruana stem from Defendants' alleged use of [resale] price maintenance. However, any antitrust infraction that may have been perpetrated was directed at [Tennessee Motors], as a corporate entity, not at Caruana as an individual. Thus, Caruana's injury is only incidental to the alleged misconduct . . . ." *Caruana*, No. 3:01-1567, slip op. at 21. But the district court then reversed course: despite its initial focus on the distinction between shareholder injury and corporate injury, the concept of GM and GMAC targeting Caruana *personally* for his advocacy of invoice-price selling moved the court to find standing. There is no reconciling the court's initial determination that the pricing conspiracy aimed "to prevent [Tennessee Motors] from utilizing invoice price selling . . . and not Caruana individually," *Caruana*, No. 3:01-1567, slip op. at 21–22, with its conclusion that the conspiracy sought to "force a change in ownership and control in [Tennessee Motors] directed at Caruana personally because of his advocacy of invoice price selling." *Id.* at 22. We see the chain of causation between the alleged conspiracy to harm the business and injury to Caruana's ownership/management interest as too attenuated to be "injury of the type the antitrust laws were intended to prevent." *Valley Prods.*, 128 F.3d at 402 (quoting *Brunswick,* 429 U.S. at 489).

We buttress this conclusion by consideration of the second and conceptually-related factor,

"the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market." *Southaven*, 715 F.2d at 1085. Caruana is neither a consumer nor a competitor in the relevant market; he is a shareholder and employee of a competitor. He suffered investment and employment losses, while Tennessee Motors suffered any alleged "antitrust injury" here. In *Peck v. General Motors Corp.*, 894 F.2d 844 (6th Cir. 1990), a factually analogous case, the former employees and shareholders of a car dealership driven into bankruptcy by an antitrust conspiracy did not have standing to assert antitrust claims. As the court explained, "[t]he Pecks' loss of employment income, benefit incentives and personal investments place them in no . . . position to assert standing. . . . Accordingly, the Pecks' damages are derivative and militate against granting them antitrust standing." *Id.* at 847.

We see no relevant distinction between Caruana's and the Pecks' injury. Caruana claims that the defendants' resale price maintenance scheme harmed Tennessee Motors and that, as a result of the dire financial straits caused by the scheme, Caruana was forced to seek outside investors and ultimately lost control of the Tennessee Motors business. This is no different than the Pecks' injury: Caruana suffered economic loss deriving from the effects of an antitrust conspiracy directed at the corporation itself. And Caruana's status as sole shareholder during part of the alleged conspiracy fails to distinguish his case from *Peck* because this court has refused to find that sole-shareholder status confers antitrust standing. *Meyer Goldberg, Inc. of Lorain v. Goldberg*, 717 F.2d 290, 294 & n.2 (6th Cir. 1983) (sole shareholder of a bankrupt corporation lacked antitrust standing).

- 11 -

Caruana points us to some instances in which an individual not fitting into the category of competitor or consumer in the relevant market may have standing to bring antitrust claims. *See Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982). *McCready* is inapposite to Caruana's case. As this court explained in *Southaven*, "*McCready* instructs that an injury 'inextricably intertwined' with the injury sought to be inflicted upon the relevant market or participants therein may fall 'within the area of congressional concern' so as to satisfy the [standing] inquiry." *Southaven*, 715 F.2d at 1086 (quoting *McCready*, 457 U.S. at 484). Caruana, however, does not contend that he has standing under an "inextricably intertwined" theory, nor could he. To merit standing under the "inextricably intertwined" category, a plaintiff must assert that defendants used him as a "a fulcrum, conduit or market force to injure competitors or participants in the relevant product or geographical markets." *Id.*

*McCready* concerned a purchaser of psychotherapy services and not a competitor of the alleged conspirators. The Supreme Court ruled the purchaser nevertheless had antitrust standing "because her injury was integrally connected to the harm the conspirators sought to inflict [and she] was actively manipulated by conspirators. . . ." *Peck*, 894 F.2d at 847 (citing *McCready*, 457 U.S. at 483–84). Just as in *Peck*, though, Caruana claims injury derived from the effects of the conspiracy perpetrated against Tennessee Motors; he was not manipulated or used by defendants in carrying out their conspiracy. *See id.*

As regards the third and fourth *Southaven* factors, the directness or indirectness of the injury,

whether the damages are speculative, and the potential for duplicative recovery or complex apportionment of damages, because Caruana asserts only shareholder injury not cognizable under the antitrust laws, we bypass questions of the nature of his damages as inapposite to this case. *Southaven*, 715 F.2d at1085.

And finally, the fifth *Southaven* factor examines the existence of more direct victims of the alleged antitrust violation. 715 F.2d at 1085. The district court found that "[i]f Caruana is denied standing to sue, no one else has incentive to restore competition to the automotive market and these antitrust injuries to [Tennessee Motors] and the market remain unaddressed." *Caruana*, No. 3:01-1567, slip op. at 23–24. While the district court's observation may have been correct, it does not cure the central defect with Caruana's complaint, i.e., his injuries are not antitrust injuries, but merely derivative injuries. Moreover, if there were a conspiracy between GM and the other unidentified defendants to terminate price-cutting car dealers, at least two more direct victims of the violation exist: Tennessee Motors and the consumers themselves.

After considering each *Southaven* factor, we find that Caruana does not establish standing to assert his antitrust claims.

### III.

We hold that the district court erred in finding that Caruana established standing to pursue claims under the ADDCA and the federal antitrust laws. We therefore reverse the district court's

No. 05-5458
*Caruana v. Gen. Motors Corp.*

denial of GM's motion to dismiss and remand for proceedings consistent with this opinion.